**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING AND DEVELOPMENT, )<br>)<br>) | |
| ) | Case No.: 2:24-cv-00332-JRG |
| Plaintiff, ) | |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | |
| ) | |
| CISCO SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

**OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 3

II. ASSERTED PATENTS ............................................................................................. 3

    A. The '630 Patent ................................................................................................3

    B. The '691 Patent ................................................................................................4

    C. The '884 Patent ................................................................................................5

III. LEVEL OF ORDINARY SKILL IN THE ART ..................................................... 6

    A. POSITA for the '630 Patent .............................................................................6

    B. POSITA for the '691 Patent .............................................................................6

    C. POSITA for the '884 Patent .............................................................................7

IV. DISPUTED CLAIM TERMS AND PHRASES ...................................................... 7

    A. TERM 1: "role name" ('630 Patent, claim 18) ...............................................7

    B. TERM 2: "customer policy" ('630 Patent, claim 18) ....................................10

    C. TERM 3: "an egress interface of one of multi-protocol label switching tunnels" ('630 Patent, claim 18) ...................................................................11

    D. TERM 4: "the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups" ('630 Patent, claim 22) ....................................13

    E. TERM 5: "sending the mapping policy to the network interfaces further comprises…" ('630 Patent, claim 23) ...................................................14

    F. TERM 6: "providing a Backup Label Switched Path (LSP) to a Bypass LSP already established for a Protected Primary LSP" ('691 Patent, claims 1, 6) ......................................................................................................................15

    G. TERM 7: "Backup LSP to said Bypass LSP" ('691 Patent, claims 1, 3, 6, 8) ......................................................................................................................17

    H. TERMS 8 and 9: "point of local repair" and "merge point" ('691 Patent, claims 1, 3-6, 8-10) .......................................................................................17

    I. TERM 10: "a bandwidth that is currently allocated for [each of] the data flow[s]" ('884 Patent, claims 1, 11, 17, 20) ...................................................19

    J. TERM 11: "a proportional allocation of a total bandwidth of the network switching element" ('884 Patent, claims 1, 11, 17, 20) .........................20

    K. TERM 12: "the over-subscription ratio being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target p[a/o]rt" ('884 Patent, claims 11, 20) ................................................22

V. CONCLUSION....................................................................................................... 25

# TABLE OF AUTHORITIES

**<u>CASES</u>**

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
  811 F.3d 1334 (Fed. Cir. 2016) ................................................................................... 15

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014) ................................................................................... 18

*GSK Techs. Inc. v. Eaton Elec. Inc.*, Nos. 606-CV-358-LD,
  2008 U.S. Dist. LEXIS 26232 (E.D. Tex. Apr. 1, 2008) .......................................... 19

*Imperium (IP) Holdings v. Apple Inc.*,
  920 F. Supp. 2d 747 (E.D. Tex. 2012) ........................................................................ 22

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ..................................................................................... 16

*Lionra Techs. Ltd. v. Cisco Sys., Inc.*, No. 2:24-CV-00097-JRG,
  2025 U.S. Dist. LEXIS 90408 (E.D. Tex. May 10, 2025) ........................................ 18

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*,
  75 F.3d 1545 (Fed. Cir. 1996) ..................................................................................... 22

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ..................................................................................................... 10

*Novo Indus. v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003) ................................................................................... 22

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ..................................................................................... 8

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................................. 6, 8

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) ................................................................................... 15

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ..................................................................................... 9

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1369 (Fed. Cir. 2012) ................................................................................... 14

## I.    INTRODUCTION

Plaintiff Brazos submits this Opening Claim Construction Brief in support of its proposed constructions for the claim terms in dispute for  U.S. Patent Nos. 7,386,630, 8,982,691, and 9,450,884. Brazos's proposed constructions are supported by the intrinsic record. In contrast, Defendant Cisco's proposed constructions define technical claim terms with redundant jargon and needlessly confusing language that is not readily understandable to a lay factfinder. Moreover, none of the claim terms in dispute are indefinite, as they are easily understood by a person of ordinary skill in the art when read in the context of the patent specification and surrounding claim language. In addition, Cisco's proposals in certain instances go well beyond positions taken by Cisco in co-pending IPRs.

Accordingly, Brazos respectfully requests that the Court adopt Brazos's proposed constructions and reject Cisco's improper attempts to import confusing limitations, disregard the intrinsic record, and alter the intended scope of the patents-in-suit.

## II.    ASSERTED PATENTS

The asserted patents are U.S. Patent Nos. 7,386,630, 8,982,691, and 9,450,884.

### A.    The '630 Patent

The '630 Patent, entitled *Using Policy-based Management to Support Diffserv over MPLS Network*, provides a method of configuring differentiated services over multi-protocol label switching (Diffserv/MPLS) in a communications network. '630 Patent at Abstract. The inventions disclosed in the '630 Patent help configure network devices regarding packet treatment and routing decisions (such as MPLS and Diffserv) without having to do so one device at a time. '630 Patent at 2:29-45; 4:19-31.

The inventors of the '630 Patent disclosed embodiments including devices, software and methods for policy-based management of two combined functionalities (Diffserv over MPLS) in

a single network. '630 Patent at 4:19-31. Specifically, the '630 Patent discloses embodiments describing packet-forwarding policies designed to administer, manage, and control access to network resources. *Id.* For example, in one embodiment, a policy server is employed to implement the management of the network as a whole. *Id.* The policy server translates business goals or policies into configurations of network resources, and automates the configurations across multiple different network elements and different technologies (e.g., MPLS and Diffserv). *Id.* As one result, this centralized approach ensures policy consistency across multiple network elements. *Id.*

### B.    The '691 Patent

The '691 Patent, entitled *System and Method Providing Standby Bypass for Double Failure Protection in MPLS Network*, provides a system and method of protecting a Bypass Label Switched Path (LSP) in a Multiprotocol Label Switched (MPLS) Fast Reroute (FRR) system to accommodate double-fault scenarios. '691 Patent at 2:10-13. The inventions disclosed in the '691 Patent help mitigate network outages and associated downtime, thereby ensuring network reliability. *Id.* at 1:62-2:6.

The inventors of the '691 Patent disclosed embodiments wherein several MPLS Label Switched Routers were connected by various LSPs in a network. *See, e.g.*, '691 Patent at 5:23-46. Traversal through a network would, for example, occur via a LSP—a Protected Primary LSP— that would connect a network node at one end of the network to another node at the other end of the network via intervening nodes. *Id.* at 5:38-40. That Protected Primary LSP would be protected against a fault occurring along that LSP by a Bypass LSP, which would route around a fault on that Protected Primary LSP by determining a different path starting from the node just upstream of where the fault was detected (the point of local repair), routing around the fault via other nodes, and then rejoining the Protected Primary LSP once past the fault at a downstream node (the merge point). *Id.* at 5:40-42. To prevent unacceptable network interruption, the Bypass LSP would be

4

established prior to the failure of the Protected Primary LSP so that in the event of a fault on the Primary LSP, crucial network traffic may be re-routed efficiently to the Bypass LSP. *Id*. at 5:49-51; *see also id.* at 1:16-21. However, should a fault occur on the Bypass LSP—that is, should the network experience a double-fault scenario where both the Protected Primary LSP and the Bypass LSP are compromised—a need exists for another backup option to route network traffic. *Id*. at 1:63-2:6. The '691 Patent discloses such a solution wherein the already-established Bypass LSP is protected by its own Backup LSP. *See*, *e.g.*, '691 Patent at Fig. 3, 3:60-64; 5:47-58; 6:4-50; *see also id*. at 1:63-2:6.

### C.    The '884 Patent

The '884 Patent, entitled *Software Defined Networking Based Congestion Control*, describes techniques for "adjusting bandwidth allocation by a network element in a communications network." '884 Patent at 1:46-47. The '884 Patent explains that network congestion occurs at the physical network switches, and more specifically at the output-port of the switches. *Id.* at 11:13-32. However, as described in the '884 Patent, "most data center switches do not address network congestion, which may result in packet losses and may affect a quality of service (QoS) of some data flows." *Id.* at 1:24-26. The inventors realized that packet loss in data centers is due to data bursts rather than high-link utilization, and therefore simply adding more switch capacity would not effectively address network congestion. *Id.* at 1:26-33.

The '884 Patent teaches using a "network element,"—e.g., a switch or router—to adjust the bandwidth allocated to its various ports. *Id.* at 1:48-51. "[T]he network element includes a plurality of ports, the plurality of ports including a target port and each of the plurality of ports is assigned a corresponding bandwidth allocation." *Id.* at 1:61-64. The network element monitors the dataflow traversing one of its ports, which the '884 Patent calls the "target port." *Id.* at 50-52. The network element determines the bandwidth currently allocated to the target port and then calculates

5

the fair-share bandwidth of the target port based on the total bandwidth of the network element (or switch) itself. *Id.* at 1:52-60. Having calculated the fair-share bandwidth, the network element (or switch) adjusts the bandwidth allocation of the target port based on the fair-share bandwidth allocation. *Id.* The goal of this bandwidth allocation adjustment is to alleviate network congestion. *Id.* at 11:13-32.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

### A.    POSITA for the '630 Patent

A person of skill in the art as of November 21, 2003, the priority date of the '630 Patent, would have had a working knowledge of the computer networking art that is pertinent to the '630 Patent, including techniques for managing and configuring network devices. Such a POSITA would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent, and approximately two years of professional experience working in the field of network communications and would be knowledgeable regarding packet-based computer networking. Alternatively, a POSITA at the time of the '630 Patent may have additional years of practical and relevant work or research experience as substitution for less or different technical education, and vice versa.

### B.    POSITA for the '691 Patent

The level of ordinary skill in the art as of September 28, 2012, the priority date of the '691 Patent, would be a person who would have at least a bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent, and approximately two years of experience working in the field of network communications and would be knowledgeable regarding MPLS techniques. Alternatively, a POSITA at the time of the '691 Patent may have additional years of practical and relevant work or research experience as substitution for less or different technical education, and vice versa.

6

C.    **POSITA for the '884 Patent**

The level of ordinary skill in the art as of July 11, 2014, the priority date of the '884 Patent, would be a person who has at least a bachelor's degree in computer science, computer engineering, electric engineering, or an equivalent, and approximately two years of experience working in the field of network communications and would be knowledgeable regarding network switching operations. Alternatively, a POSITA at the time of the '884 Patent may have additional years of practical and relevant work or research experience as substitution for less or different technical education, and vice versa.

IV.    **DISPUTED CLAIM TERMS AND PHRASES**

A.    **TERM 1: "role name" ('630 Patent, claim 18)**

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "role name" | Plain and Ordinary Meaning | "a name (distinct from an interface identifier) that is assigned to interfaces that will get the same set of rules or policies" |

The claim term "role name" should be accorded its plain and ordinary meaning, as the patentee did not act as a lexicographer, and Cisco's proposal needlessly adds language by importing a select portion of the file history ("a name … that is assigned to interfaces that will get the same set of rules or policies") while inserting a needless Cisco-generated parenthetical untethered to the intrinsic record ("(distinct from an interface identifier)"). Even though the patentee did not define "role name," Cisco nonetheless seeks to turn two words into twenty-two. Adding so much surplusage would serve only to confuse the jury without adding clarity.

While the prosecution history does include the applicant's comment that "the role names are such that interfaces with the same role names will get the same set of rules and policies," that comment was made in reference to patentee's explanation that the examiner's asserted prior art reference "Edmondson[, which] does not mention assigning such role names. Edmondson merely

discloses generating a vendor's specific access list 'for the specific router(s) that will be marking the traffic for quality of service treatment using, for example Diffserv.'" *See* Ex. 1 at BRAZOS-CISCO2-00000106. Therefore, applicant was not narrowly defining "role name," but was instead explaining that a vendor-specific access list for the specific router(s) that will be marking the traffic for quality-of-service treatment using, e.g., Diffserv—as purportedly disclosed by the examiner's cited Edmondson reference—has no characteristics of a role name. *Id.*

In addition, that this exemplary description from the specification was ***not*** limiting is confirmed earlier in the prosecution history, where applicant expressly cited the specification's exemplary description of role name—"network interfaces are arranged to have assigned role names. Interfaces with the same role names will get the same set of rules or policies"—and specifically clarified to the examiner that as to this portion of the specification, "'[a]pplicants are not importing limitations from specification. It is well established that the claims terms are understood in view of the specification.'" *See id.* at BRAZOS-CISCO2-00000134. Thus, the applicant clearly informed the examiner that this exemplary description of "role name" was not limiting, and that the application should be examined accordingly. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."). As such, no prosecution history disclaimer attaches here.

Furthermore, the specification's description of the term "role name" occurs in connection with particular exemplary embodiments. Indeed, the specification itself explicitly and repeatedly cautions that these descriptions are not limiting, and that the relevant portions of the specification occur in connection with a specific exemplary use case. *See* '630 Patent at 3:42-45 ("The present

invention is now described. While it is disclosed in its preferred form, the specific embodiments of the invention as disclosed herein and illustrated in the drawings are not to be considered in a limiting sense."); 4:56-63 ("***In this case***, policy targets are network devices that are to implement the specific routing assignments, and the device specific commands are deployed to the interfaces of such network devices. The network interfaces are arranged to have assigned role names. Interfaces with the same role names will get the same set of rules or policies. Each role name is then associated with a network policy and a customer policy.") (emphasis added); 5:28-31("FIG. 4B is a block diagram illustrating the operational architecture of policy server 410 that supports Diffserv over MPLS traffic engineering ***according to an embodiment of the invention***.") (emphasis added); 5:58-6:24 ("***According to one embodiment***, different types of policies are used including: Service policies, network policies, customer policies and mapping policies. Service policies map a service name chosen by an operator to any of the fourteen DSCP numbers defined by Difserv [*sic*]. … In a large network, the same set of policies can be applied to multiple routers or network interfaces. To achieve better scalability, network interfaces are assigned role names and the policies are specified and associated with the roles name. Network interfaces identified by the same role names receive the same set of policies.") (emphasis added).

Finally, in contrast with Cisco's above-described attempt to improperly import descriptions of exemplary embodiments from the specification, the embedded parenthetical phrase "(distinct from an interface identifier)" within Cisco's proposed construction appears to have no basis at all in the either the specification or prosecution history and should also be rejected. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("We indulge a 'heavy presumption' that claim terms carry their full ordinary and customary meaning unless the patentee

unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution.") (internal citation omitted).

The Court should therefore reject Cisco's improper attempt to deviate from the plain and ordinary meaning.

**B.    TERM 2: "customer policy" ('630 Patent, claim 18)**

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "customer policy" | Plain and Ordinary Meaning | "a policy that defines the rules applied to forward certain types of customer traffic, and includes source/destination host groups, application profiles, traffic profiles, service class policing action and role names" |

As an initial matter it is black letter law that the words of the claim itself are among the best sources to determining a term's meaning. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). And here the surrounding words of claim 18 itself provide the plain and ordinary meaning of the term "customer policy." Specifically, claim 18 recites "defining a customer policy comprising a tunneling mode and a tunnel group identifier, the customer policy being configured to govern the treatment of individual customer traffic." '630 Patent at 14:1-4. Claim 18 itself thus provides the plain and ordinary meaning of "customer policy" as "comprising a tunneling mode and tunnel group identifier, the policy being configured to govern the treatment of individual customer traffic." The applicant otherwise does not act as its own lexicographer within the specification—and so plain and ordinary meaning is the proper constructions. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012).

Despite this lack of lexicography, Cisco still seeks to improperly import limitations from the specification by pointing to exemplary language. Specifically, Cisco's proposed

construction—"a policy that defines the rules applied to forward certain types of customer traffic, and includes source/destination host groups, application profiles, traffic profiles, service class policing action and role names"—appears to be lifted from the specification's description of an exemplary embodiment. *See* '630 Patent at 5:28-31 ("FIG. 4B is a block diagram illustrating the operational architecture of policy server 410 that supports Diffserv over MPLS traffic engineering ***according to an embodiment of the invention***.") (emphasis added); 5:58-6:9 ("***According to one embodiment***, different types of policies are used including: Service policies, network policies, customer policies and mapping policies. Service policies map a service name chosen by an operator to any of the fourteen DSCP numbers defined by Difserv [*sic*]. … Customer policies define the rules applied to forward certain types of customer traffic. Customer policies include source destination host groups, application profiles, traffic profiles, service class, policing action and role names.") (emphasis added). The placement of this exemplary statement regarding "customer policy" as part of the Figure 4 exemplary embodiment confirms that it is not intended to be definitional. *See id.* at 5:28-31; 5:58-6:9. Furthermore, Cisco's proposed construction would be confusing for the jury, replacing two words with more than thirty, while also resulting in confusingly nested definitions within definitions (given that, per above, claim 18 already recites "defining a customer policy comprising…"). The Court should therefore reject Cisco's improper attempt to deviate from the plain and ordinary meaning.

### C.     TERM 3: "an egress interface of one of multi-protocol label switching tunnels" ('630 Patent, claim 18)

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "an egress interface of one of multi-protocol label switching tunnels" | Not indefinite; plain and ordinary meaning | Indefinite |

The term "an egress interface of one of multi-protocol label switching tunnels" allows a person of ordinary skill in the art, reading the term in light of the surrounding claim language as well as the specification, to understand the scope of the invention with reasonable certainty. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indeed, this language was extensively reviewed by the patent examiner (herself a POSITA) during prosecution, with the examiner even making amendments to the claim (*see* Ex. 1 at BRAZOS-CISCO2-00000018-20), as well as the applicant explicitly amending the claim to add this language (*see id.* at BRAZOS-CISCO2-00000055) and then discussing the amendments in relation to the prior art (*see id.* at BRAZOS-CISCO2-00000062-63). By thereafter allowing the claim (*see id.* at BRAZOS-CISCO2-00000021), the examiner demonstrated she understood the scope of the invention.

Furthermore, claim 18 does not contain any terms of degree or omit any significant antecedent basis, while the claim terms have exemplary descriptions within the specification. *See, e.g.*, '630 Patent at 8:18-33 ("In order to decide which network interfaces should receive the Diffserv/MPLS customer policies, the policy server utilizes input/output role names, and the MPLS gateways of the source and destination hosts. The input role names are assigned to the ingress interfaces of the tunnel group's edge devices. The output role names are assigned to the egress interfaces of the tunnel group's edge devices. The customer traffic may enter or leave from one or a subset of the tunnel group's edge devices. Thus, the MPLS gateways of the source and destination host groups are specified to decide which network interfaces the policy deploys to. For example, to map classified traffic into a specific MPLS tunnel, the rule deploys to the ingress interfaces of the Source gateways. Similarly, to configure the tunneling mode, the rule deploys to the egress interfaces of the destination gateways.").

In contrast, Cisco provides no testimony from a person of skill in the art to contravene the examiner, prosecution history, claim language, or patent specification. The Court should therefore confirm that this term does not render the claim indefinite.

**D.    TERM 4: "the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups" ('630 Patent, claim 22)**

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups" | Not indefinite; plain and ordinary meaning | Indefinite |

The term "the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups" allows a person of ordinary skill in the art, reading the term in light of the surrounding claim language as well as specification, to understand the scope of the invention with reasonable certainty. *See Nautilus*, 572 U.S. at 901. Indeed, this language was extensively reviewed by the patent examiner (herself a POSITA) during prosecution, with the examiner even making an amendment to this very claim language, (*see* Ex. 1 at BRAZOS-CISCO2-00000018-20), thereby demonstrating she understood the scope of the invention.

Furthermore, claim 22 does not contain any terms of degree or omit any significant antecedent basis, while the claim terms have exemplary descriptions within the specification. *See, e.g.*, '630 Patent at 6:6-11; 7:1-8; 8:18-33; 10:38-56.

In contrast, Cisco provides no testimony from a person of skill in the art to contravene the examiner, prosecution history, claim language, or patent specification. The Court should therefore confirm that this term does not render the claim indefinite.

**E.    TERM 5: "sending the mapping policy to the network interfaces further comprises…" ('630 Patent, claim 23)**

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "sending the mapping policy to the network interfaces further comprises…" | Not indefinite; plain and ordinary meaning | Indefinite |

The term "sending the mapping policy to the network interfaces further comprises…" allows a person of ordinary skill in the art, reading the term in light of the surrounding claim language as well as the specification, to understand the scope of the invention with reasonable certainty. *See Nautilus*, 572 U.S. at 901. Indeed, this language was extensively reviewed by the patent examiner (herself a POSITA) during prosecution, with the examiner even making an amendment to this claim language (*see* Ex. 1 at BRAZOS-CISCO2-00000018-20) and thereby demonstrating that she understood the scope of the invention.

Furthermore, claim 23 does not contain any terms of degree or omit any significant antecedent basis, while the claim terms have exemplary descriptions within the specification. *See, e.g.*, '630 Patent at 4:41-59; 7:63-8:7; 10:61-11:6.

In contrast, Cisco provides no testimony from a person of skill in the art to contravene the examiner, prosecution history, claim language, or patent specification. The Court should therefore confirm that this term does not render the claim indefinite.

**F.    TERM 6: "providing a Backup Label Switched Path (LSP) to a Bypass LSP already established for a Protected Primary LSP" ('691 Patent, claims 1, 6)**

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "providing a Backup Label Switched Path (LSP) to a Bypass LSP already established for a Protected Primary LSP" | Plain and Ordinary Meaning | "maintaining at the same time a Protected Primary LSP, a Bypass LSP, and a Backup LSP, before failure of the Protected LSP" |

There is no reason to depart from the plain and ordinary meaning for the above term. First, none of the words comprising the disputed claim term are difficult to understand. It is clear from the face of the disputed term that three separate LSPs are implicated by the claim language: the Protected Primary LSP, the Bypass LSP, and the Backup LSP, with the term "LSP" or "Label Switched Path" a known term of art to someone of ordinary skill in the networking arts. In particular, the introductory verb "providing" does not need construction; it should carry its plain meaning. *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim controls.").

Moreover, the disputed term appears in the ***preamble*** section of asserted claims 1 and 6. To the extent that a POSITA seeks to interpret this term, such POSITA need only look to the remainder of the claim language to discern exactly what the patentees intended the disputed term to cover. Indeed, where the disputed term appears in the specification, it is followed by language that closely mirrors the claim language. *See*, *e.g.*, '691 Patent at 2:14-28 (reciting the steps of the method claim for "providing a Backup Label Switched Path (LSP) to a Bypass LSP already

15

established for a Protected Primary LSP"); 2:51-67 (reciting non-transitory machine-readable storage medium encoded with instructions for the method).

Rather than rely on the plain meaning of understandable terms that appear in the claim, Cisco proposes that the Court construe the term as "maintaining at the same time a Protected Primary LSP, a Bypass LSP and a Backup LSP, before failure of the Protected LSP."

Cisco apparently relies on a statement in the prosecution history where the patentee clarified, in the context of a claim amendment, that unlike the prior art, "[t]he three LSPs [of the '691 Patent] are maintained at the same time, one actively, and the other two as backups." Ex. 2 at BRAZOS-CISCO2-00000567. However, as that same amendment further details, the patentee also ***amended the claim language*** to "amplify these differences between the claims and the cited references," rendering the preceding explanation traversing the prior art superfluous. *See id.*

The remainder of the claim language following the preamble acknowledges the existence of the three LSPs. For example, after the preamble—which specifically recites each of the three LSPs—the claim further requires that the Primary LSP is protected against "dual failures." *See also* '691 Patent at 1:63-2:5 (addressing a double failure scenario where "both primary and Bypass LSPs would be broken."). Cisco's redundant proposed construction should be rejected because the majority of that proposed construction appears further along in the claims themselves; the disputed term need not be restated. *See*, *e.g.*, *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (rejecting construction of a claim term that would render other claim language superfluous); *see also Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored.").

Finally, Cisco's additional requirement that the LSPs exist concurrently "before failure of the Protected LSP" is also not required by the claim language and must be rejected. Plain and ordinary meaning will suffice.

### G.     TERM 7: "Backup LSP to said Bypass LSP" ('691 Patent, claims 1, 3, 6, 8)

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "Backup LSP to said Bypass LSP" | Plain and Ordinary Meaning | "an LSP to be used in the event that the Bypass LSP fails in the future" |

As with the prior disputed claim term, the Court should apply plain and ordinary meaning and reject Cisco's unnecessary restatement of easily understood verbiage. The Backup LSP is the object of the asserted claims, and it is clear from the claim language that the Backup LSP protects the Bypass LSP in case the Bypass LSP fails. *See*, *e.g.*, '691 Patent, Claims 1 and 6. This is amply supported by the specification. *See*, *e.g.*, *id.* at 2:14-28; 2:51-67.

Moreover, Cisco's additional restriction of "in the future" contravenes the entire point of the '691 Patent—i.e., avoiding network disruption caused by on-the-fly fault remediation. *See*, *e.g.*, *id*. at 1:63-2:6. The invention thus necessitates that the Backup LSP is calculated as a "disjoint path" ahead of any failure of the Bypass LSP. *See*, *e.g.*, *id*. at 2:14-28; 2:32-67; 3:4-17.

### H.     TERMS 8 and 9: "point of local repair" and "merge point" ('691 Patent, claims 1, 3-6, 8-10)

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "point of local repair" | Plain and Ordinary Meaning | "node which redirects the traffic onto the preset Backup path" |
| "merge point" | Plain and Ordinary Meaning | "node where a Backup LSP merges with the primary LSP" |

The Court should apply plain and ordinary meaning to these disputed terms. To the extent that a POSITA needs to reference the specification to discern their respective meanings, "point of

17

local repair" and "merge point" are discussed throughout the '691 Patent, usually in reference to one another. *See*, *e.g.*, '691 Patent at 1:42-47; 2:14-28; 2:32-43; 2:44-67; 3:4-17; 5:38-46; 5:47-58. Cisco seeks to construe "point of local repair" and "merge point" as a "node which redirects the traffic onto the preset Backup path" and "node where a Backup LSP merges with the primary LSP," respectively. In doing so, however, Cisco invites the Court to read into the claim terms limitations from one or more specific embodiments of the invention. This is improper. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Moreover, Cisco's proposed construction of "point of local repair"—i.e., "node which redirects the traffic onto the preset Backup path"—is seemingly at odds with the rest of the intrinsic evidence. Cisco's construction implies that the point of local repair node itself is the actor that "redirects the traffic," rather than merely being the point within the network at which traffic is redirected by, for example, a network processor. *See*, *e.g.*, '691 Patent at 1:14-16 (acknowledging that service providers "typically use[] some form of protection mechanism for protecting the LSPs from any un-expected [*sic*] failures."); *id.* at 1:38-48 (describing the function of the point of local repair); *id.* at 1:49-56 (acknowledging both local and IP layer recovery mechanisms); *id.* at 2:14-28 (describing an embodiment of the invention performed by a network processor); *id*. at 4:7-5:20 (discussing network elements and components known to a person of ordinary skill, the details of which are not necessary to be shown for the invention to be practiced). Because Cisco's construction is overly constrictive and seeks to import into the claim a limitation from one

embodiment disclosed in the specification, the Court should reject it in favor of plain and ordinary meaning.

## I.    TERM 10: "a bandwidth that is currently allocated for [each of] the data flow[s]" ('884 Patent, claims 1, 11, 17, 20)

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "a bandwidth that is currently allocated for [each of] the data flow[s]" | Plain and Ordinary Meaning | "number of bytes allocated to [each of] the data flow[s] at the current time" |

This claim phrase is clear on its face and requires no construction. For its part, in the co-pending IPR Cisco had no issue understanding this term's plain and ordinary meaning—which Cisco agreed should govern that proceeding. Ex. 3 (Petition in IPR2025-00429) at 12 ("Petitioner submits that, for the purposes of this proceeding and the grounds presented herein, no claim term requires express construction."). Cisco's proposed construction, which substitutes "currently" with "at the current time" and "bandwidth" with "number of bytes," adds complexity without any redeeming comprehensibility. First, Cisco's substitution of "currently" with "at the current time" fails to add clarity beyond the claim term itself. Moreover, the specification does not once use the term "at a current time," but exclusively uses the term "currently." *See, e.g.*, '884 Patent at Abstract; 1:52-55; 2:67-3:2; 4:5-9; 4:54-57.

Second, Cisco's substitution of "a bandwidth" with "number of bytes" limits the claimed entity "a bandwidth" to one unit of its measure, akin to limiting "a volume" to "number of milliliters." But the claimed invention does not require a particular unit of measure to work. In fact, claim 1's method could work with any units. While the specification happens to use the unit of measure "bytes" in a mathematical illustration within an embodiment of Figure 4 ('884 Patent at 17:14-20; 18:17-21), this illustration is described as just an embodiment: "In the ***example***

*embodiment* illustrated by FIG. 4, the weighted fair-share value is 5,000 bytes and the network fair-share value is 12,500 bytes, so the advertising window of the TCP header will be altered to indicate that the bandwidth allocation should be limited to 5,000 bytes." *Id.* at 18:17-21 (emphasis added); *see also id.* at 5:21-23 ("FIG. 4 illustrates an operation diagram for operating SDN-based congestion management, according to an ***example embodiment***.") (emphasis added). This use is far from the "exacting" standards required for lexicography or disavowal. *See Lionra Techs. Ltd. v. Cisco Sys., Inc.*, No. 2:24-CV-00097-JRG, 2025 U.S. Dist. LEXIS 90408, at *8 (E.D. Tex. May 10, 2025) ("The standards for finding lexicography or disavowal are 'exacting.'") (quoting *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)).

**J.    TERM 11: "a proportional allocation of a total bandwidth of the network switching element" ('884 Patent, claims 1, 11, 17, 20)**

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "a proportional allocation of a total bandwidth of the network switching element" | Plain and Ordinary Meaning | "a number of bytes for the target port calculated as a proportion of the total number of bytes available to the network switching element" |

This claim phrase has no need for construction. Again, Cisco had no issue proceeding with the plain and ordinary meaning of this term in the co-pending IPR proceeding. *See* Ex. 3 (Petition in IPR2025-00429) at 12.

Cisco's proposal again rewrites this otherwise straightforward phrase by adding complexity without any redeeming comprehensibility. Cisco's proposal (1) limits the conceptual entities "a proportional allocation" and "total bandwidth" to units of their measure, (2) adds needless terms "for the target port" and "calculated," and (3) substitutes "total [bandwidth] of the

network switching element" with "total [number of bytes] available to the network switching element." None of these changes are warranted.

First, as with Term 10, the claimed invention does not require a particular unit of measure and the mathematical illustration in the specification does not indicate disavowal or lexicography. As with the prior term, the mathematical illustration using "bytes" is described as just an embodiment. *See* '884 Patent at 18:17-21; 5:21-23.

Second, Cisco's insertions of "for the target port" and "calculated as a proportion" are superfluous and add nothing to the construction. *See GSK Techs. Inc. v. Eaton Elec. Inc.*, Nos. 606-CV-358-LD, 2008 U.S. Dist. LEXIS 26232, at *10 (E.D. Tex. Apr. 1, 2008) ("Reading these limitations into the term 'control voltage output signal' would create a redundancy and would add nothing to the construction."). The full claim stanza already specifies that the "proportional allocation" is for "the target port": "determining, by the network switching element, a fair share bandwidth allocation *for the target port*, the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element." '884 Patent at 22:8-13 (emphasis added). As to "calculated as a proportion," a proportion is definitionally a particular kind of calculation—so there is no reason to specify further that a proportion is calculated. Moreover, the specification consistently uses the term "proportional allocation of" and never uses the term "calculated as a proportion." *See, e.g.*, *id.* at Abstract; 1:57-58; 4:8-12; 4:66-67; 12:67-13:5; 13:32-37.

Finally, Cisco's substitution of "total [bandwidth] of the network switching element" with "total [number of bytes] available to the network switching element" introduces unnecessary complexity without providing additional clarity to the subject term. The specification repeatedly

and exclusively discloses "total bandwidth of the network switching element" and does not once use Cisco's wording. *See, e.g.*, Abstract; 1:57-58; 3:11-12; 4:9-13; 4:66-67; 12:65-67; 13:32-37.

### K.     TERM 12: "the over-subscription ratio being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target p[a/o]rt" ('884 Patent, claims 11, 20)

| Claim Term/Phrase | Plaintiff Brazos's Proposed Construction | Defendant Cisco's Proposed Construction |
|---|---|---|
| "the over-subscription ratio being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target p[a/o]rt" | Plain and Ordinary Meaning | Indefinite. OR "the over-subscription ratio is calculated as the bandwidth allocation of the target port divided by the number of data flows traversing the target port" |

This term is not indefinite, as evidenced by Cisco's ability to make out an interpretation in its alternative construction. Rather, the language in question allows a person of ordinary skill in the art, reading the term in light of the surrounding claim language as well as specification, to understand the scope of the invention with reasonable certainty. *See Nautilus*, 572 U.S. at 901.

The term itself spells out what the "over-subscription ratio" is: "a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target port." Nothing in this definition lacks demarcation. In each of Claims 11 and 20, "the bandwidth allocation of the target port" is introduced in the prior stanza as "being a bandwidth that is currently allocated for each of the data flows traversing the target port." Moreover, "data flows traversing the target port" is introduced in the respective first stanzas, so the later-recited "a number of data flows traversing the target port" is simply "a number of" the earlier-recited "data flows traversing the target port." Notably, Cisco does not allege indefiniteness in the stanzas where these terms are first introduced,

calling into question why terms that find antecedent basis in definite terms are indefinite themselves. Finally, a "ratio" is an easily understandable mathematical term for a jury to apply. And tellingly, Cisco's own alternative construction uses all three of these phrases—"the bandwidth allocation of the target port," "the number of data flows traversing the target port," and "ratio"—suggesting no apparent indefiniteness.

To the extent Cisco's indefiniteness allegation hinges on the term "the target part," this spelling is an obvious clerical error. First, this term uses the definite article "the" to reference a previously introduce term "target port," and a POSITA would understand this reference. Second, the phrase "data flows traversing the target port" is used twice in prior stanzas and a POSITA would understand "data flows traversing the target part" was intended as another use of that phrase. Third, the remaining claims confirm this understanding. For example, claim 20, which is an apparatus correlate to method claim 11, recites the same limitation, but without the misspelling. '884 Patent at cl. 20. Third, the specification provides descriptions of exemplary embodiments where the "over-subscription ratio" is "a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target port." *See, e.g.*, '884 Patent at 3:3-6; 4:58-60; 15:63-65. Finally, the prosecution history likewise suggests that "target part" was a clerical error and not indefinite. Specifically, claim 11 was found allowable in the first office action (Ex. 4 at BRAZOS-CISCO2-00000748), indicating the Patent Office understood the scope of this claim when comparing it to the prior art. The Applicant did not otherwise comment on claim 11 during prosecution to suggest "target part" had some meaning other than "target port." A POSITA would understand from claim 11 itself, corresponding claim 20, the specification's exclusive use of "target port," and the prosecution history that "target part" is a simple misspelling of "target port."

Cisco's own proposed construction, which correctly rewrites "the target p*a*rt" as "the target p*o*rt," recognizes this obvious error.

Judicial notice is appropriate as there is no reasonable debate that "target p*a*rt" is an error and as the prosecution history does not suggest a different interpretation of claim 11. *See, e.g.*, *Imperium (IP) Holdings v. Apple Inc.*, 920 F. Supp. 2d 747, 757 (E.D. Tex. 2012) ("Judicial correction of an error in a patent may be available 'if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'") (quoting *Novo Indus. v. Micro Molds Corp.*, 350 F.3d 1348 (Fed. Cir. 2003)).

Cisco's proposed construction should also be rejected for forcing needless "[m]athematical precision" on top of an already clear and sufficiently precise claim term. *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996) ("Mathematical precision should not be imposed for its own sake; a patentee has the right to claim the invention in terms that would be understood by persons of skill in the field of the invention."). Cisco's construction seeks to mathematically define the "over-subscription ratio" in terms of one way it can be calculated: by dividing the "bandwidth allocation of the target port" with "a number of data flows traversing the target port." Such mathematical precision is not required.

Nor is such mathematical precision even supported by the intrinsic evidence. The specification consistently discloses the over-subscription ratio as "being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target port." *See, e.g.*, '884 Patent at 3:3-6; 4:58-60; 15:63-65. And the specification never places a limitation as to how the ratio is calculated, much less that it is "calculated as the bandwidth allocation of the target port divided by the number of data flows traversing the target port." Indeed, the specification never

discloses that the "over-subscription ratio" is calculated in the manner recited by Cisco's proposal. *See generally id.* at 13:41-64; 15:63-16:10. There is no reason to depart from the plain and ordinary meaning.

## V.    CONCLUSION

As discussed above, Brazos's proposed constructions remain consistent with the plain and ordinary meaning of the claim language itself and the intrinsic evidence. In contrast, Cisco's constructions improperly attempt to read in unnecessary, overly narrow, and confusing technical terms and limitations, and to render indefinite claims whose meaning would be clear to a person of skill in the art. Accordingly, the Court should adopt Brazos's proposed constructions.

DATED: September 8, 2025

**FOLIO LAW GROUP PLLC**

*/s/ Joseph M. Abraham*
Joseph M. Abraham, TX SB No. 24088879
Timothy Dewberry, TX Bar No. 24090074
**FOLIO LAW GROUP PLLC**
13492 Research Blvd., Suite 120, No. 177
Austin, TX 78750
Tel: 737-234-0201
Email: joseph.abraham@foliolaw.com
        timothy.dewberry@foliolaw.com

Alden Lee, CA Bar No. 257973
Alexandra Fellowes, CA Bar No. 261929
Moses Xie, CA Bar No. 343007
Katherine Bentfield, WA Bar No. 61548
**FOLIO LAW GROUP PLLC**
1200 Westlake Ave. N., Ste. 809
Seattle, WA 98109
Tel: (206) 880-1802
Email: alden.lee@foliolaw.com
        alexandra.fellowes@foliolaw.com
        moses.xie@foliolaw.com
        katherine.bentfield@foliolaw.com

Gregory P. Love, TX Bar No. 24013060
Mark D. Siegmund, TX Bar No. 24117055
Will Ellerman, TX Bar No. 24007151
**Cherry Johnson Siegmund James PLLC**
7901 Fish Pond Road, Ste. 200
Waco, TX 76710
Tel: 254-732-2242
Email: glove@cjsjlaw.com
        msiegmund@cjsjlaw.com
        wellerman@cjsjlaw.com

*Attorneys for Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing & Development*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document *via* the Court's CM/ECF system on September 8, 2025.

*/s/ Joseph M. Abraham*
Joseph M. Abraham