# EXHIBIT 3

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

CISCO SYSTEMS, INC.,
Petitioner

_____

IPR2025-00429
U.S. Patent No. 9,450,884

**PETITION FOR *INTER PARTES* REVIEW
UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104**

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

## **<u>TABLE OF CONTENTS</u>**

Petitioner's Exhibit List ......................................................................4

I.    Introduction.................................................................................7

II.   Grounds for standing ..................................................................7

III.  Note.............................................................................................7

IV.   Summary of the '884 patent .......................................................8

V.    Prosecution history ....................................................................9

VI.   Effective priority date of the '884 patent ................................11

VII.  Level of ordinary skill in the art .............................................11

VIII. Claim construction....................................................................12

IX.   Relief requested and the reasons for the requested relief.............12

X.    Identification of how the claims are unpatentable......................12

      A.    Challenged Claims and Statutory Grounds for Challenges .............. 12

      B.    Statement of Material Facts....................................... 13

      C.    Ground 1 .................................................................. 16

            1.    Feroz................................................................ 16

            2.    Riddle .............................................................. 21

            3.    Reasons to combine Feroz and Riddle.................... 22

            4.    Claim 1 ............................................................ 22

            5.    Claim 17 .......................................................... 57

XI.   Discretionary denial is inappropriate...........................................60

A.    No basis for 35 U.S.C. § 325(d) denial ............................... 79

B.    Discretionary denial under *Fintiv* is not appropriate. ....................... 79

    1.    No evidence regarding a stay .................................. 79

    2.    Parallel proceeding trial date .................................. 79

    3.    Investment in the parallel proceeding ...................... 80

    4.    Overlapping issues with the parallel proceeding ..................... 81

    5.    Identity of parties ................................................. 82

    6.    Other circumstances ............................................. 82

C.    Discretionary denial under *General Plastic* is not appropriate .......... 83

XII.    Conclusion .................................................................83

XIII.    Mandatory notices ...................................................84

A.    Real party-in-interest .......................................... 84

B.    Related matters ................................................. 84

C.    Lead and back-up counsel and service information ........................ 84

Certificate of Word Count ...............................................86

Certificate of Service .....................................................87

## PETITIONER'S EXHIBIT LIST

| Ex.1001 | U.S. Patent No. 9,450,884 to Hwang, et al. ("Hwang") |
|---|---|
| Ex.1002 | Prosecution History of U.S. 9,450,884 |
| Ex.1003 | Declaration of Paul Min, Ph.D. under 37 C.F.R. § 1.68 |
| Ex.1004 | *Curriculum Vitae* of Paul Min, Ph.D. |
| Ex.1005 | U.S. Patent No. 7,453,804 to Feroz, et al. ("Feroz") |
| Ex.1006 | U.S. Patent No. 7,406,522 to Riddle ("Riddle") |
| Ex.1007 | U.S. Patent No. 8,949,444 to Ma et al. ("Ma") |
| Ex.1008 | U.S. Patent Publication No. 2007/0248009 to Petersen ("Petersen") |
| Ex.1009 | U.S. Patent Publication No. 2009/0097495 to Palacharla ("Palacharla") |
| Ex.1010 | Robert Breyer and Sean Riley, SWITCHED, FAST, AND GIGABIT ETHERNET, 3d ed. (Macmillan Technical Publishing 1999), selected pages. |
| Ex.1011 | Complaint - *WSOU Investments, LLC v. Cisco Systems, Inc.* EDTX-2-24-cv-00332. |
| Ex.1012 | Federal Court Trial Statistics – June 30, 2024. |
| Ex.1013 | Docket Control Order - *WSOU Investments, LLC v. Cisco Systems, Inc.*, No. 2-24-cv-00332, (E.D. Tex. August 5, 2024). |
| Ex.1014 | The Ethernet, A Local Area Network, Data Link Layer and Physical Layer Specifications, version 2.0 (Nov. 1982) ("DIX Ethernet") |
| Ex.1015 | IEEE Standard 802.3i-1990 (selected pages) |
| Ex.1016 | IEEE Standard Dictionary of Electrical and Electronics Terms, 4th ed. (1988) (selected pages) |

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

| Ex.1017 | Newton's Telecom Dictionary, 17th ed. (2001) (selected pages). |
|---------|---------------------------------------------------------------|
| Ex.1018 | US 2003/0174649 to Shankar et al. |
| Ex.1019 | U.S. Patent No. 7,869,366 to Muppala et al. |
| Ex.1020 | U.S. Patent No. 7,822,837 to Urban et al. |
| Ex.1021 | US 2013/0100858 to Kamath et al. |
| Ex.1022 | US 2006/0209858 to Blum |
| Ex.1023 | US 2003/0014624 to Maturana et al. |
| Ex.1024 | US 2003/0091165 to Bearden et al. |
| Ex.1025 | US 2006/0013221 to De Cnodder et al. |
| Ex.1026 | US 2009/0097494 to Yuan |
| Ex.1027 | US 2008/0123649 to Wang et al. |
| Ex.1028 | US 2003/0041146 to Davis et al. |
| Ex.1029 | U.S. Patent No. 6,496,478 to Choi et al. |
| Ex.1030 | US 2006/0013133 to Peng et al. |
| Ex.1031 | US 2004/0153460 to Corl, Jr. |
| Ex.1032 | U.S. Patent No. 5,999,538 to Haddock et al. |
| Ex.1033 | US 2007/0277228 to Curtis |
| Ex.1034 | US 2004/0105467 to Goodman |
| Ex.1035 | US 2012/0250728 to Pischl et al. |
| Ex.1036 | US 2012/0314794 to Powell et al. |
| Ex.1037 | US 2005/0063370 to Beshai et al. |
| Ex.1038 | US 2015/0156096 to Roh |

| Ex.1039 | US 2009/0031038 to Shukla et al. |
|---------|----------------------------------|
| Ex.1040 | US 2003/0223414 to Wong |
| Ex.1041 | U.S. Patent No. 5,606,668 to Shwed |
| Ex.1042 | U.S. Patent No. 6839767 to Davies et al. |
| Ex.1043 | US 2011/0205895 to Chen et al. |
| Ex.1044 | U.S. Patent No. 7,046,665 to Walrand et al. |
| Ex.1045 | US 2001/0048683 to Allan et al. |
| Ex.1046 | U.S. Patent No. 6,301,251 to Kim et al. |
| Ex.1047 | US 2005/0175014 to Patrick |
| Ex.1048 | U.S. Patent No. 7,061,861 to Mekkittikul et al. |
| Ex.1049 | U.S. Patent No. 6,038,216 to Packer |
| Ex.1050 | US 20020161923 to Foster et al. |

## I.    INTRODUCTION

Pursuant to 35 U.S.C. §§ 311, 314(a), and 37 C.F.R. § 42.100, Cisco
Systems, Inc. ("Petitioner") respectfully requests that the Board review and cancel
as unpatentable under 35 U.S.C. §103 claims 1 and 17 (hereinafter, the
"Challenged Claims") of U.S. 9,450,884 (the "'884 Patent," Ex.1001).

The '884 Patent describes adjusting bandwidth allocation based on a fair-
share bandwidth allocation. Ex.1001, Abstract. As shown below and confirmed in
the Declaration of Paul Min (Ex.1003), such concepts were well known. The prior
art Feroz reference, for example, describes "fair share bandwidth allocation and
dynamic allocation of bandwidth in response to detected traffic utilization."
Ex.1005, Abstract. As Petitioner's analysis below demonstrates, Feroz and the
other references presented in this Petition render obvious the Challenged Claims.

Accordingly, Petitioner respectfully requests that the Board institute *inter
partes* review and cancel as unpatentable the Challenged Claims of the '884 patent.

## II.    GROUNDS FOR STANDING

Petitioner certifies that the '884 patent is eligible for IPR and that Petitioner
is not barred or estopped from requesting IPR challenging the patent claims. 37
C.F.R. § 42.104(a).

## III.    NOTE

Petitioner cites to non-patent literature exhibits by their original page

numbers wherever possible. **Emphasis** in quoted material has been added. Claim terms are presented throughout in *italics*.

## IV.    SUMMARY OF THE '884 PATENT

The '884 Patent relates to "[m]ethods and systems of adjusting bandwidth allocation." Ex.1001, Abstract. The '884 patent describes "a network element" for "monitoring a data flow traversing a target port." Ex.1001, Abstract. The network element "determin[es] a bandwidth allocation for the target port, determin[es] a fair-share bandwidth allocation for the target port, and adjust[s] the bandwidth allocation for the target port based on the fair-share bandwidth allocation." Ex.1001, Abstract. "The fair-share bandwidth allocation is a proportional allocation of a total bandwidth of the network element." Ex.1001, Abstract, 1:57-58, 3:12-13, 4:9-13.

The disclosed bandwidth management techniques may be incorporated into a "switch." Ex.1001, 7:39-44. Within the switch, an "SDN controller 230… monitors all data flows that traverse each port." Ex.1001, 12-50-52. "Additionally, in such embodiments the SDN controller 230 computes, calculates, or otherwise determines a fair-share bandwidth allocation and/or weighted fair-share bandwidth allocation for each data flow." Ex.1001, 12:61-64. That information is then used to "adjust a current bandwidth allocation for the data flow." Ex.17:59-62. The data flow may be manipulated, for example, by "altering the advertisement window

value in the TCP header" of packets. Ex.1001, 18:7-10. Manipulating the

advertisement window values acts to adjust the bandwidth allocation "along an

entire path of a data flow (i.e., an end-to-end path)." Ex.1001, 18:10-16.

These ideas were not new.

## V.     PROSECUTION HISTORY

In a first Office action, the initial independent claims of the '884 patent

application were rejected as anticipated by U.S. Patent No. 8,949,444 to Ma.

Ex.1002, 57. The applicants responded by amending independent claim 1 to recite

that the claim steps are performed by a "network <u>switching</u> element." Ex.1002, 38.

That amendment, however, was not argued as distinguishing Ma—nor would it.

Ex.1002, 48-49; *see* Ex.1001, 8:11-57 (describing "switches" as devices that

process data packets "at the data link layer (layer 2) of the OSI model, and/or

process data (or data packets) at the network (layer 3)" or that "connect two or

more devices" in a "computer network"); *compare with* Ex.1007, Fig. 1 (showing

proxy devices connecting other devices in a network), 6:62-67 ("communication

interface 260 may include… an Ethernet interface"), 7:1-2 ("device 200 may

perform operations and/or processes related to managing TCP flows."); *see also*

*infra*, Material Facts #2-6.

Instead, the applicants argued that Ma's proxy device monitors only the

"round trip times (RTT) of acknowledgment messages (ACKs) for data flows,"

whereas claim 1 requires "*monitoring… a data flow traversing the target port of the [network] switching element*." Ex.1002, 48. Thus, the applicants argued that Ma was deficient because "Ma does not monitor data traveling through a 'target port' of the proxy device 120, itself." Ex.1002, 48.

The applicants also argued that "Ma does not teach regulating a bandwidth for a port at the proxy device 120." Ex.1002, 48. "Rather," applicants argued, "Ma teaches regulating data flow for bandwidth allocation of ports at the user device 110 and resource 130 (i.e., at a source and destination of the data flow)." Ex.1002, 48-49. Thus, Ma allegedly failed to disclose both "*determining*" steps and the "*adjusting*" step of claim 1. Claim 17 was argued to be allowable for the same reasons, since claim 17 "contains features similar to claim 1." Ex.1002, 49.

The Examiner then allowed all claims.  The Examiner's statement of reasons for allowance highlighted the "*monitoring*" step and the second "*determining*" step:

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

> Claim 1 is allowed because the closest prior art, Ma et al (U.S.
>
> Patent No. 8949444),  and Excell (U.S. Patent Publication No. 2012/0195192), either
>
> singularly or in combination, fail to anticipate or render obvious a method comprising:
>
> "monitoring, by the network switching element, a data flow traversing the target port of
>
> the network switching element," and "determining, by the network switching element, a
>
> fair-share bandwidth allocation for the target port, the fair-share bandwidth allocation
>
> being a proportional allocation of a total bandwidth of the network switching element," in
>
> combination with all other limitations in the claim as claimed and defined by applicants.

Ex.1002, 22.

## VI.    EFFECTIVE PRIORITY DATE OF THE '884 PATENT

The '884 patent issued from a non-provisional application filed on June 11,
2014. There is no claim of priority.  Thus, the effective priority date of the '884
patent is June 11, 2014. The provisions of Title 35 as amended by the Leahy-Smith
America Invents Act apply to the '884 patent. *See* 35 U.S.C. § 100(note).

## VII.   LEVEL OF ORDINARY SKILL IN THE ART

A Person of Ordinary Skill in The Art ("POSITA") in June 2014 would have
had a working knowledge of the computer networking art that is pertinent to the
'884 Patent, including techniques for managing and allocating bandwidth within
network devices. A POSITA would have had a master's degree in computer
science, computer engineering, electrical engineering, or an equivalent, and two
years of professional experience relating to packet-based computer networking.

Lack of professional experience can be remedied by additional education, and vice versa. Ex.1003, ¶15.

## VIII. CLAIM CONSTRUCTION

Claim terms in IPR are construed according to their "ordinary and customary meaning" to those of skill in the art. 37 C.F.R. § 42.100(b). Petitioner submits that, for the purposes of this proceeding and the grounds presented herein, no claim term requires express construction. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

## IX.   RELIEF REQUESTED AND THE REASONS FOR THE REQUESTED RELIEF

Petitioner asks that the Board institute a trial for *inter partes* review and cancel the Challenged Claims in view of the analysis below.

## X.   IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A.   Challenged Claims and Statutory Grounds for Challenges

| Grounds | Claims | Basis |
|---------|--------|-------|
| #1 | 1, 17 | 35 U.S.C. § 103 over Feroz in view of Riddle |
| #2 | 1, 17 | 35 U.S.C. § 103 over Petersen |
| #3 | 1, 17 | 35 U.S.C. § 103 over Petersen in view of Palacharla |

U.S. 7,453,804 to Feroz et al. (Ex.1005, "**Feroz**") issued on November 18, 2008.

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

U.S. 7,406,522 to Riddle (Ex.1006, "**Riddle**") issued on July 29, 2008.

U.S. 20070248099 to Petersen (Ex.1008, "**Petersen**") was published on October 25, 2007.

U.S. 20090097495 to Palacharla (Ex.1009, "**Palacharla**") was published on April 16, 2009.

Feroz, Riddle, Petersen, and Palacharla are prior art under 35 U.S.C. § 102(a)(1).[1]

Petitioner also cites below to additional prior art as evidence of the background knowledge of a POSITA and to provide contemporaneous context to support Petitioner's assertions regarding what a POSITA would have understood from the prior art in the grounds. *See Yeda Research v. Mylan Pharm. Inc.*, 906 F.3d 1031, 1041-1042 (Fed. Cir. 2018) (affirming the use of "supporting evidence relied upon to support the challenge"); 37 C.F.R. § 42.104(b); *see also K/S HIMPP v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1365-66 (Fed. Cir. 2014); *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1363 (Fed. Cir. 2016).

### B.    Statement of Material Facts

1.    Packet-based networking using Ethernet, Internet Protocol (IP), and Transmission Control Protocol (TCP) were well-known in the art. Ex.1006, 1:59-

---

[1] The references would also qualify as prior art under pre-AIA 35 U.S.C. § 102(b).

60; Ex.1022, [0015]; Ex.1023, [0003].

**2.** The Open Systems Interconnection (OSI) model for describing computer networking ideas was well-known in the art. Ex.1024, [0008].

**3.** Under the OSI model, Layer 2 corresponds to the data link layer; an example of a layer 2 networking protocol is Ethernet. Ex.1024, [0008]; Ex.1023, [0003].

**4.** Under the OSI model, Layer 3 corresponds to the networking layer; an example of a layer 3 networking protocol is Internet Protocol (IP). Ex.1024, [0008]; Ex.1023, [0003].

**5.** Switches and routers were well-known network devices that would forward data packets—sometimes called data frames—between ports using layer 2 address information (such as an Ethernet MAC address) or layer 3 address information (such as an IP address). Ex.1025, [0019]; Ex.1018, [0005], [0029]; Ex.1027, [0020]; Ex.1028, [0013]; Ex.1024, [0008].

**6.** It was well-known in the art that some network switches were also capable of forwarding packets based on Layer 3 address information, such as an IP address. Ex.1029, 2:59-65; Ex.1024, [0009].

**7.** It was well-known in the art for an Ethernet network switch to have two or more network interfaces and for the Ethernet network switch to forward packets between or among its network interfaces. Ex.1026, [0004]; Ex.1030,

[0036], [0040]; Ex.1031, [0005].

8.     Ethernet network interfaces were known to support either full-duplex or half-duplex operation, but full-duplex operation was more common. Ex.1032, 8:1-15; Ex.1033, [0002]; Ex.1034, [0017]; Ex.1035, [0049]; Ex.1036, [0025].

9.     Full-duplex refers to the simultaneous transmission of information in two directions. Ex.1016, 398; Ex.1017, 296.

10.     Half-duplex relates to transmission of information in either of two directions, but only one direction at a time. Ex.1016, 430; Ex.1017, 296, 320.

11.     Techniques for classifying packets into data flows were well-known in the art. Ex.1005, 8:12-17, 18:36-39; Ex.1037, [0045].

12.     Techniques for controlling the amount of bandwidth used by a data flow were well-known in the art. Ex.1038, [0025]; Ex.1039, [0067]; Ex.1040, [0007]; Ex.1005, 13:59-64; Ex.1006, 5:10-19, 2:49-59, 14:2-5; *see generally* Ex.1049.

13.     In a packet-based communication network, attempting to transmit data in excess of the available bandwidth generally results in dropped packets (where packets fail to reach their destination), a result that was known to be undesirable. Ex.1041, 7:31-34; Ex.1042, 3:53-57; Ex.1043, [0009]; Ex.1044, 6:20-32.

14.     It was well-known in the art to use a switch as an edge switch. Ex.1021, [0023]; Ex.1045, [0034]; Ex.1037, [0055]; Ex.1046, 3:39-43; Ex.1050,

[0005].

## C.    Ground 1

### 1.    Feroz

Like the '884 patent, Feroz generally relates to the field of packet-based
computer networking. Ex.1005, 5:55-60 ("The computer network environment… is
a packet-based communications environment…"), 1:7-2:39 (incorporating by
reference numerous applications "Packet" networking); *see* Ex.1001, 2:4-12, 8:11-
15, 11:4-13. Feroz specifically refers to employing the well-known "TCP/IP
protocol suite, which is widely implemented throughout the world-wide data
communications network environment called the Internet and many wide and local
area networks." Ex.1005, 2:63-66. The '884 patent similarly refers to protocols that
were known in the art, like "Ethernet" and "Internet Protocol version 4 (IPv4)."
Ex.1001, 8:35-36; Material Fact #1.

Feroz also addresses the same problem as the '884 patent, namely,
controlling bandwidth allocations in a communications network. Ex.1005, 2:46-49,
4:37-41; Ex.1001, 1:45-47.

Feroz is therefore analogous art to the '884 patent.

Feroz describes an "application traffic management device 130" located
between a network 40 and another network 50, as shown in Fig. 1 below. Ex.1005,
5:62-64. The data path between the two networks also includes an access link 21.

Ex.1005, 5:53-55. The "application traffic management device 130 is operative to

classify and manage data flows traversing access link 21." Ex.1005, 5:64-67.



**Ex.1003, ¶39; Ex.1005, Fig. 1 (annotated).**

To manage the data flows, application traffic management device 130

includes a "flow control module 94" that "is operative to apply aggregate and per-

flow bandwidth utilization controls to data flows traversing the access link 21 in

the inbound and/or outbound directions." Ex.1005, 6:4-6, 6:51-52, 7:5-9. In short,

Feroz's application traffic management device 130 manages the bandwidth

available on access link 21 by monitoring and controlling data flows as they pass

through application traffic management device 130. Ex.1003, ¶¶40-43; *see*

Ex.1005, 12:8-35 (describing traffic classification for "data flows that traverse

access link 21" by classifying data flows at network interfaces 71 and 72 of

application traffic management device 130); Material Facts #11-12.  The flow

control module 94 and other components of application traffic management device

130 are shown in Fig. 2 below.



**Ex.1005, Fig. 2 (annotated).**

Feroz's approach to controlling data flows employs "fair share bandwidth allocation and dynamic allocation of bandwidth in response to detected traffic utilization." Ex.1005, Abstract. Based on observed bandwidth demand and a fair-share analysis of the available bandwidth, Feroz's method computes a "target rate" for individual data flows. This process is broadly outlined in Fig. 4B, below.



**Ex.1003, ¶43; Ex.1005, Fig. 4B (annotated).**

Feroz explains that bandwidth allocations (including per-flow bandwidth

allocations) are recomputed periodically, for example, every 125 milliseconds.

Ex.1005, 22:4-23, Fig. 7. After new target rates are computed for the data flows,

the new target rates are enforced by the flow control module 94. Ex.1005, 13:7-9,

13:39-45, 25:34-36 & 25:45-52.

## 2. Riddle

Like the '884 patent, Riddle generally relates to the field of packet-based computer networking. Ex.1006, 2:5-8; *see* Ex.1001, 2:4-12, 8:11-15, 11:4-13, 17:27-28. Riddle also similarly refers to using "the TCP/IP protocol suite" and network communications under the "Open Systems Interconnection (OSI) model." Ex.1006, 2:8-13; *see* Ex.1001, 8:35-36, 8:20-25; Material Facts #1-2.

Riddle also addresses the same problem as the '884 patent, namely, controlling bandwidth allocations in a communications network. Ex.1006, 5:36-39, 6:35-41, 17:11-22; Ex.1001, 1:45-47.

Riddle is therefore analogous art to the '884 patent.

Like Feroz, Riddle describes using partitions for dynamic bandwidth allocations. Riddle further explains that a partition may correspond to traffic specifically associated with a particular network interface:

> For example, the root node may represent the access link in both the inbound and outbound direction, while **child partitions from the root can correspond to traffic encountered at a given network interface (such as interface 71)** and destined for egress from a second network interface (such as interface 72).

Ex.1005, 17:12-17.

### 3.    Reasons to combine Feroz and Riddle

A POSITA when considering the teachings of Feroz would have also considered the teachings of Riddle because Feroz expressly cites to and incorporates Riddle by reference to Riddle's application number (09/966,538). Ex.1005, 1:7-10, 1:56-58. Ex.1003, ¶¶49-52.

Further reasons supporting the Feroz-Riddle combination are provided in the detailed claim analysis below.

### 4.    Claim 1

**[1.0]** ***A method of adjusting bandwidth allocation by a network switching element in a communications network, the network switching element including a target port, the method comprising:***

The extent that the preamble is limiting, Feroz renders it obvious.

Feroz describes "Methods… directed to an aggregate bandwidth utilization control scheme including fair share bandwidth allocation and dynamic allocation of bandwidth." Ex.1005, Abstract. Feroz's methods include "dynamically respond[ing] to observed bandwidth utilization," such as by "dynamically adjusting the aggregate bandwidth allocations." Ex.1005, Abstract, 25:60-62; *see also* Ex.1005, 7:24-28. Feroz's dynamic response includes updating bandwidth allocations "on a continuous basis" or at "periodic intervals (e.g., 125 milliseconds, etc.)." Ex.1005, 13:14-17, 22:4-10. Feroz also refers to these periodic intervals as "adjustment interval[s]." Ex.1005, 23:64-65. By performing dynamic bandwidth

allocation, Feroz renders obvious a "*method of adjusting bandwidth allocation*." Ex.1003, ¶¶53-55.

### *"…by a network switching element… including a target port"*

Feroz's bandwidth allocation techniques are performed by an "application traffic management device 130" that is "deployed at the edge of network 40," shown in Fig. 1 below. *See* Ex.1005, 5:62-6:3, 7:10-28.



**Ex.1003, ¶62; Ex.1005, Fig. 1 (annotated).**

The "application traffic management device 130 is operative to classify and manage data flows traversing access link 21." Ex.1005, 5:65-67; Material Facts

#11-12. For example, application traffic management device 130 processes header

data fields associated with OSI layer 2, such as a "MAC address." Ex.1005, 11:15-

23; Material Facts #3, 5. The application traffic management device 130 also

processes header data fields associated with OSI layer 3, such as "source and

destination IP addresses." Ex.1005, 18:7-9, 11:15-23; Material Facts #4-6. Thus, it

would have been obvious to a POSITA for application traffic management device

130 to be a "*network switching element*." Ex.1003, ¶59-61; *see* Ex.1001, 8:11-25.

Alternatively, it would have been obvious to a POSITA to combine

application traffic management device 130 with router 22. Ex.1003, ¶62. In another

patent application, the named inventor Azeem Feroz described a very similar

"application traffic management device 130" and stated that "device 130 may be

contained in router 22." Ex.1019, 4:43-48. The Feroz reference also incorporates

by reference another patent describing "application traffic management device

130" and stating that "the present invention can be integrated into a variety of

network devices." Ex.1020, 5:3-15; *see* Ex.1005, 1:7-10, 2:40-42. Thus, the

combination of application traffic management device 130 and router 22 also

render obvious the claimed "*network switching element*." Ex.1003, ¶62; Material

Facts #5-6; *see* Ex.1001, 8:11-25.

Consistent with application traffic management device 130 being a "*network

switching element*," the application traffic management device 130 includes "first

and second network interfaces 71, 72 [that] can be wired network interfaces, such
as Ethernet (IEEE 802.3) interfaces." Ex.1005, 6:34-36; Material Fact #7. The
"application traffic management device 130 can include additional network
interfaces, beyond network interfaces 71 and 72, to support additional access links
or other functionality." Ex.1005, 6:41-45. Especially in embodiments where the
application traffic management device 130 has three or more Ethernet interfaces, it
would have been obvious to a POSITA for application traffic management device
130 to be a "*network switching element,*" since application traffic management
device 130 would need to decide how to forward packets received at any one of its
network interfaces. Ex.1003, ¶61. Any of the application traffic management
device 130's network interfaces corresponds to the claimed "*target port.*" Ex.1003,
¶65. As an example in the specific context of network traffic coming from network
50 through application traffic management device 130 to a client (such as client 42
shown in Fig. 2 below), it would have been obvious to a POSITA for the
application traffic management device 130's inside network interface 71 to be a
"*target port.*" Ex.1003, ¶65. Similarly, for network traffic flowing in the opposite
direction (e.g., from client device 42 to network 50), it would have been obvious to
a POSITA for outside network interface 72 to be a "*target port*." Ex.1003, ¶65.



Fig._2

**Ex.1003, ¶65; Ex.1005, Fig. 2 (annotated).**

### *…in a communications network…*

The network 40 is "a local area network, a wide area network, or any other suitable network" which provides "a packet-based communications environment, employing TCP/IP protocols." Ex.1005, 5:49-6:3. Thus, network 40 is a "*communications network*." Ex.1003, ¶¶57-58.

Alternatively, the entirety of Feroz's Fig. 1, which shows a "network

26

environment" including networks 40 and 50, corresponds to the claimed

"*communications network*." Ex.1005, 5:39-40; Ex.1003, ¶58.

In summary, Feroz's application traffic management device that performs

dynamic bandwidth allocation renders obvious the preamble. Ex.1003, ¶¶53-66.

**[1.1]** ***monitoring, by the network switching element, a data flow traversing the
target port of the network switching element;***

As discussed at [1.0], Feroz's application traffic management device 130

corresponds to the claimed *network switching element*.

Feroz explains that application traffic management device 130 includes a

"flow control module 94" that "monitors bandwidth demand." Ex.1005, 13:7-38.

One disclosed method of evaluating bandwidth demand is that "**packets in a**

**flow**… received by application traffic management device 130 during a given time

interval **can be monitored**." Ex.1005, 13:17-22. Feroz's "packets in a flow"

correspond to a "*data flow*," since it would have been obvious to a POSITA that

the packets contain data and since Feroz elsewhere describes processing "data

packets" and detecting "new data flows." Ex.1005, 6:57-59; *see also* Ex.1005,

13:7-9 ("data flows traversing access link 21"); Ex.1003, ¶¶68-71. Feroz further

explains that flow control module 94 maintains "per-flow statistics…, such as the

current rate of the flow…, packet count, and the like." Ex.1005, 19:18-22. These

monitoring and statistics-maintaining actions by the flow control module 94 (part

of application traffic management device 130) render obvious "*monitoring, by the network switching element, a data flow.*" Ex.1003, ¶¶72-75.

Feroz also describes a packet processor 92 within the application traffic management device 130. Ex.1005, Fig. 2; 6:4-6 & 6:51-52. The packet processor 92 also "maintain[s] one or more flow variables or statistics (such as packet count, current rate, etc.) in connection with the data flows." Ex.1005, 6:62-64. For example, "packet processor 92 updates, for existing data flows, attributes of [a] flow object in response to the packet such as the packet count, last packet time, and the like." Ex.1005, 18:28-31; *see generally* Ex.1005, 17:64-18:64 (describing how packet processor 92 processes each packet by creating or updating a "flow object" for the corresponding data flow). It would have been obvious to a POSITA that maintaining such flow variables would involve "*monitoring… a data flow.*" Ex.1003, ¶¶72-75. As Feroz describes, maintaining a statistic such as a packet count involves monitoring the data flow to observe each packet and, upon identifying a packet in the data flow, incrementing the packet count. Ex.1005, 18:28-31; Ex.1003, ¶74. Since the flow variables and statistics are maintained by a packet processor within the application traffic management device 130, these passages also render obvious "*monitoring, by the network switching element, a data flow….*" Ex.1003, ¶75.

Additionally, Feroz describes how to "control inbound traffic and reduce the

inefficiencies associated with dropped packets." Ex.1005, 3:18-22; *see also id.* 7:6-

9 ("apply… bandwidth utilization controls to data flows traversing the access link

21 in the inbound and/or outbound directions."). To control the bandwidth used by

a data flow, it would have been obvious to a POSITA to monitor the data flow, for

example, to determine the flow's bandwidth utilization (data flow rate). Ex.1003,

¶80; *see, e.g.*, Ex.1005, 20:33-36 ("the current rate can be estimated, in one

implementation, by monitoring the size of incoming packets and the time at which

they are received"); *see also* Ex.1005, 18:24-27 ("this initial rate estimate is

replaced, as more packets in the flow traverse application traffic management

device 130, by a current rate based on weighted moving average over an analysis

interval"). Feroz describes using a data flow's current rate as part of its overall

process for adjusting bandwidth allocations. *See infra*, limitations [1.2] & [1.5];

Ex.1005, Fig. 4B, 20:54-21:27. These additional disclosures in Feroz further render

obvious "*monitoring, by the network switching element, a data flow*…." Ex.1003,

¶81.

### *"…traversing the target port of the network switching element"*

It would have been obvious to a POSITA for the application traffic

management device 130 to monitor a flow of data packets passing through one of

its network interfaces 71, 72 ("*traversing the target port of the network switching

element*") for multiple reasons. First, Feroz describes how "application traffic

management device 130 processes packets traversing it." Ex.1005, 17:41-42; *see*

*also* Ex.1005, 5:65-67. Feroz illustrates in Fig. 2 that an exemplary embodiment of

application traffic management device 130 has just two network interfaces. Thus,

for packets to "traverse" application traffic management device 130, it would be

obvious for the packets to be received at one network interface and then be

transmitted by the other network interface. Ex.1003, ¶76. In this way, the packets

would "traverse" both network interfaces. As discussed at [1.0], either of Feroz's

network interfaces individually corresponds to the claimed "*target port*."

Second, Feroz explains that the network interfaces 71, 72 "are the hardware

communications interfaces that receive and transmit packets." Ex.1005, 6:26-28.

Feroz explains monitoring occurs with respect to packets that are "received" by

application traffic management device 130:

> For example, the size of, and rate at which, **packets in a
> flow are received** by application traffic management
> device 130 during a given time interval **can be
> monitored** to compute a per-flow rate demand.

Ex.1005, 13:18-22.

Feroz also explains that monitoring occurs with respect to packets that are

"transmitted" by application traffic management device 130:

> In addition, **per-flow statistics are also maintained**,
> Such as the current rate of the flow (a weighted moving

30

> average over an analysis interval of the **rate at which
> packets are transmitted** from application traffic
> management device), packet count, and the like.

Ex.1005, 19:18-22.

Since the network interfaces 71, 72 are the mechanism by which application traffic management device 130 receives or transmits packets, it would have been obvious to a POSITA for the packet-monitoring operations described throughout Feroz to be applied to "packets in a flow" that traverse one of the network interfaces 71, 72. Ex.1003, ¶¶77-79.

In summary, by describing the collection and maintenance of information about data flows passing through a network interface of the application traffic management device 130, Feroz renders this limitation obvious. Ex.1003, ¶81.

**[1.2]** *determining, by the network switching element, a bandwidth allocation for the target port, the bandwidth allocation for the target port being a bandwidth that is currently allocated for the data flow;*

Feroz renders this limitation obvious. Ex.1003, ¶82.

### *"determining… a bandwidth that is currently allocated for the data flow"*

Feroz describes a currently allocated bandwidth for a data flow as a "per-flow bandwidth allocation" or a "target rate," with the two terms being substantially synonymous. *See, e.g.,* Ex.1005, 19:62, 20:5, 20:17-20. For example, Feroz describes Fig. 4B as "directed to re-computing a per-flow bandwidth

allocation" and as "directed to computing… a target rate for flows." Ex.1005, 5:10-
12, 20:6-9. Feroz's per-flow bandwidth allocation and target rate correspond to the
claimed "*bandwidth that is currently allocated for the data flow.*" Ex.1003, ¶¶83-
85.

Feroz describes computing (or re-computing) per-flow bandwidth allocation
or target rate as part of a periodic process:

> **At periodic intervals** (380), the aggregate bandwidth
> allocation daemon operates to invoke a process that, as
> discussed below, re-computes aggregate bandwidth
> allocations across the partitions (382), and a process
> (discussed above) to **re-compute the per-flow**
> **bandwidth allocations** within the partitions (384).

Ex.1005, 22:17-23.

As noted previously, Feroz explains that Fig. 4B is "directed to re-
computing a per-flow bandwidth allocation." Ex.1005, 5:10-12. Thus, Feroz
discloses that the process in Fig. 4B is performed repeatedly, for example, "at
periodic intervals (e.g., 125 milliseconds, etc.)" Ex.1005, 22:4-6; Ex.1003, ¶85.

For a new data flow, Fig. 4B shows at step 334 (annotated below) that the
target rate may be initially set to a fair share bandwidth allocation. Since the
process in Fig. 4B is performed at "periodic intervals" (Ex.1005, 22:17), the
"*current*[]" target rate for a data flow also corresponds to a flow target rate that

was computed during the previous execution of the Fig. 4B process, such as at steps 340 or 349. *See* Ex.1005, 21:3-8, 21:19-22.



**Ex.1003, ¶86; Ex.1005, Fig. 4B (annotated).**

Feroz explains that the Fig. 4B process is performed by the flow control

module 94, which is part of the application traffic management device 130.

Ex.1005, 20:22-26 ("…as FIG. 4B illustrates, flow control module 94

computes…"), Fig. 1. As discussed at [1.0], the application traffic management

device 130 corresponds to the claimed "*network switching element*." Thus, Feroz

renders obvious "*determining, by the network switching element,… a bandwidth

that is currently allocated for the data flow*." Ex.1003, ¶87.

     Feroz further confirms that the per-flow target rate is a "*current*[]"

bandwidth allocation by explaining that "the per-flow target rate is enforced," for

example, using "TCP Rate Control technologies." Ex.1005, 19:61-20:4. It would

have been obvious to a POSITA for the bandwidth allocation being enforced by

Feroz's application traffic management device 130 to be a "*current*[]" bandwidth

allocation. Ex.1003, ¶88. This is because Feroz repeatedly emphasizes

"dynamically adjust[ing] aggregate and per-flow bandwidth allocations," which

"improve[s]… network application performance." *See* Ex.1005, 19:10-12, 7:24-28,

13:9-17 ("dynamic allocation adjustments on a continuous basis"), 13:52-54;

Ex.1003, ¶88. Feroz also explains that dynamic adjustments allow the application

traffic management device 130 to be "respons[ive] to network traffic demands."

Ex.1005, 14:56-58. Feroz's repeated references to making dynamic adjustments to

bandwidth allocations would have conveyed to a POSITA that enforcing stale or

outdated bandwidth allocations is disfavored and that the per-flow target rates

being enforced should be those that are "*currently allocated*," as claimed. Ex.1003,
¶88.

### *"…a bandwidth allocation for the target port…"*

As discussed immediately above, Feroz renders obvious determining a
"*bandwidth allocation*" that is "*a bandwidth that is currently allocated for the data
flow*" by computing a per-flow target rate that is then enforced. It would have been
obvious to a POSITA for this bandwidth allocation to be "*for the target port.*"
Ex.1003, ¶¶89-90.

Feroz explains that "per-flow rate control processes may be applied to the
packets at any point prior to egress from application traffic management device
130." Ex.1005, 19:67-20:2. One example given in Feroz is of "modifying…
packets transmitted." Ex.1005, 19:61-67. Thus, it would have been obvious to a
POSITA for per-flow rate controls to be enforced with respect to either or both of
the network interfaces on the application traffic management device 130, that is,
outside network interface 72 and inside network interface 71. Ex.1003, ¶90.
Consistent with that understanding, Feroz describes how a partition may
"correspond to traffic encountered at a given network interface (such as interface
71) and destined for egress from a second network interface (such as interface
72)." Ex.1005, 17:13-17; Ex.1003, ¶91. As discussed at [1.1], either of these
network interfaces corresponds to the claimed "*target port.*" And as discussed

further below regarding limitations [1.3]-[1.5], Feroz's per-flow target rates are part of Feroz's overall partition-based bandwidth allocation scheme, and therefore it would have been obvious for the per-flow target rate to similarly "correspond to… a given network interface." Ex.1005, 17:14-15; Ex.1003, ¶92. Thus, it would have been obvious to a POSITA for Feroz's per-flow target rate to be a bandwidth allocation for a data flow at "*the target port*," as claimed. Ex.1003, ¶92.

**[1.3] *determining, by the network switching element, a fair-share bandwidth allocation for the target port,***

Feroz renders this limitation obvious Ex.1003, ¶93.

First, Feroz employs a "partition-based" bandwidth allocation scheme in which bandwidth demand is monitored in comparison to a "fair share allocation":

> As discussed more fully below, flow control module 94 enforces aggregate, partition-based bandwidth utilization controls on data flows traversing access link 21. In one implementation, flow control module 94 monitors **bandwidth demand** of each partition **relative to an aggregate, weighted fair share allocation scheme**, and dynamically re-distributes unutilized bandwidth to partitions whose demand for band width exceeds its weighted fair share allocation.

Ex.1005, 13:7-14.

As part of this process, Feroz explains that "**weighted, fair share**

**bandwidth allocations are computed** for the partitions." Ex.1005, 14:46-49. These calculations are performed by flow control module 94, which is a component within application traffic management device 130. Ex.1005, 13:7-14, 19:48-50 ("flow control module 94 re-computes the per-flow bandwidth allocation for the partition"), 21:19-21 ("Flow control module 94 assigns a flow target rate equal to the per-flow fair share bandwidth allocation,…"), 22:4-23. By these disclosures, Feroz renders obvious "*determining, by the network switching element, a fair-share bandwidth allocation...*" Ex.1003, ¶¶94-98.

Feroz explains that its "partition-based" bandwidth allocation scheme is flexible, with a partition potentially corresponding to a variety of different things. As discussed further below, Feroz's "partition-based" bandwidth allocations render obvious computing a "*fair-share bandwidth allocation for the target port*" in multiple independent ways, any one of which is sufficient.

**"*for the target port*": Bandwidth control for all traffic flowing through the "*target port*" in one direction**

Feroz describes application traffic management device 130 (and specifically, its flow control module 94) enforcing "bandwidth utilization controls to data flows traversing access link 21." Ex.1005, 13:7-17.  As can be seen from Feroz's Fig. 1, however, application traffic management device 130 is not directly connected to access link 21. However, it would have been obvious to a POSITA that

substantially all the data flows traversing access link 21 would also traverse

network interfaces 71 and 72 of the application traffic management device 130.

Ex.1003, ¶¶94-95.



**Ex.1005, Fig. 1.**

The only data flows traversing access link 21 that would not traverse at least

outside network interface 72 would be data flows that originate or terminate at

router 22. Feroz does not describe any data flows originating or terminating at

router 22; instead, Feroz merely mentions router 22 providing part of the

communication path between network 40 and network 50. Ex.1005, 5:50-53, 6:4-9.

Thus, it would have been obvious to a POSITA for there to be either no data flows

originating or terminating at router 22, or for the bandwidth used by such data
flows to be negligible. Ex.1003, ¶95. As a result, all (or substantially all) of the
data flows traversing access link 21 would also traverse network interfaces 71 and
72, thereby allowing application traffic management device 130 to apply
bandwidth utilization controls to data flows traversing access link 21 (as Feroz
contemplates) by controlling those data flows at network interface 71 or 72.
Ex.1003, ¶95.

As part of its partition-based bandwidth allocation scheme, Feroz explains
that a partition may correspond to all traffic passing in one direction through one
network interface, for example, all traffic at network interface 71 that is destined
for network interface 72—in other words, all traffic inbound to network interface
71:

> For example, the root node may represent the access link
> in both the inbound and outbound direction, while **child
> partitions from the root can correspond to traffic
> encountered at a given network interface (such as
> interface 71)** and destined for egress from a second
> network interface (such as interface 72).

Ex.1005, 17:12-17; Ex.1003, ¶99.

Further information about the use of partitions is provided in Riddle, which
Feroz incorporates by reference to its application number, no. 09/966,538.

Ex.1005, 1:56-58. Riddle explains that there may be a single partition for all traffic flowing in a particular direction, such as a partition for all inbound or all outbound communications:

> In one embodiment, at the highest level, **a partition exists for all available outbound bandwidth**, while **another partition exists for all available inbound bandwidth** across the particular access link. These partitions are then sub-dividable to form a hierarchical tree.

Ex.1006, 6:58-61; *see also* Ex.1005, 14:16-18 ("separate partition configurations and controls can be maintained for data flows traveling in the inbound or outbound directions relative to network 40"), 16:30-31 ("Other partition configurations are possible."); Ex.1003, ¶100.

"It would have been obvious to a POSITA to monitor and control bandwidth utilization as contemplated by Feroz and Riddle, that is, by treating inbound and outbound data flows separately by having just one inbound bandwidth partition and one outbound bandwidth partition for each network interface." Ex.1003, ¶101. Such an arrangement would have been "entirely sensible" to a POSITA since many network interface technologies support full-duplex communication, where transmission and reception of data can occur independently (and simultaneously); thus, transmission bandwidth is entirely separate from, and does not compete or

overlap with, reception bandwidth. Ex.1003, ¶101. Accordingly, Riddle's discussion of having one inbound bandwidth partition and one outbound bandwidth partition are entirely appropriate for Feroz's application traffic management device 130, whose Ethernet interfaces would presumably have supported full-duplex communications. Ex.1003, ¶101; *see* Ex.1005, 6:35-36, 24:59-61; Material Facts #8-10.

Where there is only a single inbound or outbound partition for a network interface, it would have been obvious to a POSITA for Feroz's process to compute a fair share bandwidth allocation for that single partition. Ex.1003, ¶102.

In summary, the combination of Feroz and Riddle contemplate monitoring and controlling bandwidth usage for all inbound data flows (or, separately, all outbound data flows) traversing a network interface of the application traffic management device 130, which renders obvious this limitation. Ex.1003, ¶102.

### "*for the target port*": Bandwidth control for the "*target port*" as a whole

To the extent that Patent Owner argues that the claim requires determining a fair share bandwidth allocation for the target port as a whole—that is, considering both data transmission and data reception by the "*target port*" together—Feroz and Riddle still render this limitation obvious. Ex.1003, ¶103. Feroz, for example, describes how "single partition configuration can be applied to both inbound and outbound data flows." Ex.1005, 14:14-20.

While most network communication technologies supported full-duplex operation in the relevant timeframe, there were known networking standards that supported half-duplex operation. Ex.1003, ¶104; Material Facts #8-10. For example, Ethernet—which Feroz contemplates using at 24:59-61—was originally a half-duplex communication technology that first introduced full-duplex communication around 1990. *See* Ex.1014, 6 ("The following are not goals of the Ethernet design: Full duplex operation…"); Ex.1015, 15, 22-24 (Figs. 14-1 and 14-2 showing a "twisted-pair link segment (duplex link segment)"); Ex.1010, 100-101, 108-109 (Table 3.7), 106 (discussing 100BASE-T4 standardized in 1995, where "full-duplex operation is not possible"). For a network interface that supports only half-duplex communication, it would have been obvious to a POSITA that bandwidth allocation must be performed for transmission and reception collectively, such as by using a single partition. Ex.1003, ¶104. This is because any time spent transmitting data is unavailable to be utilized for receiving data, and vice versa; in other words, the network interface's available bandwidth must be shared between inbound and outbound data flows. Ex.1003, ¶104.

In summary, the combination of Feroz and Riddle contemplate monitoring and controlling bandwidth usage for all inbound and outbound data flows (collectively) traversing a network interface of the application traffic management device 130, which renders obvious this limitation. Ex.1003, ¶105.

**"*for the target port*": Bandwidth control for a group of data flows
flowing through the "*target port*"**

In copending litigation, Patent Owner appears to be interpreting this
limitation as encompassing the determination of a fair share bandwidth allocation
for a group of data flows that traverse the "*target port*." While Petitioner may
challenge such an interpretation in the copending litigation, Feroz and Riddle
render such an interpretation obvious, too.

As previously discussed, Feroz explains that fair share allocations may be
made at the level of a partition:

> FIG. 9A illustrates a hierarchical partition configuration
> including three leaf partition nodes (B, C & D). Each
> node of the partition hierarchy includes a weight that
> determines **the fair share of the bandwidth a given
> partition node is allocated** from a parent partition
> relative to its sibling partition nodes.

Ex.1005, 14:63-67.

A partition, in turn, may correspond to a group of data flows that are similar
in some way, such as by pertaining to a particular traffic class, application, or user:

> A partition operates to manage bandwidth for aggregate
> data flows associated with a traffic class.

Ex.1005, 13:54-55.

> With some network devices, these **partitions can be
> configured** to provide a minimum bandwidth guarantee,
> and/or cap bandwidth, as **to a particular class of
> traffic**…. Such partitions can be applied **on a per-
> application basis** (protecting and/or capping bandwidth
> for all traffic associated with an application) **or a per-
> user basis** (controlling, prioritizing, protecting and/or
> capping bandwidth for a particular user).

Ex.1005, 3:37-47.

As discussed previously, Feroz explains that "weighted, fair share bandwidth
allocations are computed for the partitions." Ex.1005, 14:46-49. Thus, in any one
of Feroz's examples where a partition corresponds to data flows associated with
(1) a traffic class, (2) an application, or (3) a user, Feroz's bandwidth allocation
techniques render obvious determining a fair share bandwidth allocation for the
group of related data flows traversing a network interface, which renders this
limitation obvious. Ex.1003, ¶¶106-108.

**"*for the target port*": Bandwidth control for an individual data flow
through the "*target port*"**

In copending litigation, Patent Owner appears to be interpreting this
limitation as encompassing the determination of a fair share bandwidth allocation
for an individual data flow that traverse the "*target port*." While Petitioner may

challenge such an interpretation in the copending litigation, Feroz and Riddle

render such an interpretation obvious, too.

Feroz explains that fair share allocations may be provided at the individual

flow level:

> For example, partition queues are created for each leaf
> partition, and weighted, fair share bandwidth allocations
> are computed for the partitions, as discussed in more
> detail below. In addition, in one implementation, **each
> active data flow within a given partition is also
> guaranteed a fair share of the bandwidth allocated** to
> the partition.

Ex.1005, 14:46-52.

> In addition, as discussed more fully below, **each data
> flow corresponding to a given partition is allocated** a
> portion of that partition's bandwidth allocation **based on
> a fair share algorithm** discussed below.

Ex.1005, 16:44-47.

As part of guaranteeing a "fair share of the bandwidth" to an individual data

flow, it would have been obvious to a POSITA for Feroz's application traffic

monitoring device 130 to compute what that "fair share" bandwidth is. Ex.1003,

¶110-111. Feroz describes an exemplary method of "computing a per-flow fair

share allocation." Ex.1005, 20:7-8, Fig. 4B. For example, as discussed previously

at [1.2], Feroz's per-flow fair share allocation is used as part of calculating a current "target rate" for a data flow. *See supra*, limitation [1.2].

In summary, the combination of Feroz and Riddle contemplate monitoring and controlling bandwidth usage for an individual data flow traversing a network interface of the application traffic management device 130, which renders obvious this limitation. Ex.1003, ¶112.

**Conclusion for [1.3]**

In summary, Feroz and Riddle render obvious "*determining… a fair share bandwidth allocation for the target port*" in numerous ways, including where the fair share bandwidth allocation is made relative to an individual data flow, a collection of similar data flows, all data flows in a given direction, or all data flows (regardless of direction) that traverse a network interface. Ex.1003, ¶113. Any one of these mappings is sufficient to render this limitation obvious.

**[1.4]** *the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element; and*

Feroz describes allocating a "fair share of available bandwidth" based on weights assigned by a user to each partition:

> Once a partition configuration is established, in one implementation, **a user can simply assign a weight to each partition node**, which essentially expresses the priority of the network traffic class(es) falling within the

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

partition relative to other traffic classes. Optionally, a user may also assign a minimum aggregate bandwidth allocation to one or more of the selected partition nodes. As discussed in more detail below, **each partition is then <u>allocated a fair share of available bandwidth based on the weights assigned to the partitions</u>**, limited by the minimum and maximum bandwidth settings configured for any partitions.

Ex.1005, 14:21-31.

Feroz continues by describing how the fair share bandwidth is computed for each partition in proportion to its assigned weight:

In one implementation, starting from the root node, the weights of the direct child nodes (here, A & B) are compared to allocate available bandwidth of the root partition. The band width allocation that each node receives, in one implementation, is based on the following equations:

$$\text{Aggregate Weight} = \Sigma \text{Weights from Child Nodes}$$

$$\text{Allocation Per Partition } (c) = \frac{\text{Parent Allocation} * \text{Configured Weight of Partition } (c)}{\text{Aggregate Weight}}$$

Ex.1005, 14:67-15:14; Ex.1003, ¶115-116.

Specifically, the term $\frac{\textit{Configured Weight of Partition (c)}}{\textit{Aggregate Weight}}$ in Feroz's equations above represents a "*proportion[]*" used to allocate a parent partition's available bandwidth among its child partitions. Ex.1003, ¶117.

Feroz's proportional allocation of bandwidth is made "starting from the root node." Ex.1005, 15:1. The "Root partition node 82 represents the total capacity of access link 21." Ex.1005, 16:57-58. It would have been obvious to a POSITA for the total bandwidth capacity of access link 21 to be a "*total bandwidth*" of application traffic management device 130 at outside network interface 72, since (as discussed at [1.3]) all data flows that traverse access link 21 would also traverse outside network interface 72. Ex.1003, ¶118. For example, if application traffic management device 130 attempted to transmit data through outside network interface 72 at a higher bandwidth than access link 21 would support, some data packets would fail to reach their destinations on network 50 because they would be dropped by router 22. Such a result was known to be undesirable. Material Fact #13.

As discussed below, Feroz renders obvious calculating a "*proportional allocation of a total bandwidth*" for any of the mappings of the "*target port*" discussed at [1.3]. Ex.1003, ¶119.

### "*proportional*": Bandwidth control for the "*target port*" as a whole

As discussed at [1.3], Feroz and Riddle render obvious having a single root node partition that is "applied to both inbound and outbound data flows." Ex.1005, 14:19-20. Feroz contemplates that the root node partition "represents the total capacity of access link 21." Ex.1005, 16:57-58. Since there is only a single partition, it would have been obvious to a POSITA for the corresponding "proportional" allocation to be 100%, since there are no other partitions with which bandwidth is to be shared. Ex.1003, ¶120. As such, allocating all the available bandwidth (e.g., "total capacity of access link 21") to the root partition for outside network interface 72 the renders obvious "*the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element.*" Ex.1003, ¶120.

As also discussed at [1.3], Feroz and Riddle render obvious a situation where available bandwidth must be allocated between transmission and reception, for example, because the network interface supports only half-duplex communications. For such a situation, Feroz describes having "separate partition configurations… for data flows traveling in the inbound or outbound directions." Ex.1005, 14:14-20. Thus, a user would provide weights to bias the available communication bandwidth either equally (where the inbound and outbound partitions have equal weights), in favor of data reception (where the inbound

partition has a larger weight value than the outbound partition) or in favor of data transmission (where the outbound partition has a larger weight value than the inbound partition). Ex.1003, ¶121. In any of these scenarios, Feroz's equations for allocating the available bandwidth among the inbound and outbound partitions would do so in proportion to the user-assigned weights. Thus, the allocation would be "*a proportional allocation*" as claimed. Ex.1003, ¶121.

### "*proportional*": Bandwidth control for all traffic flowing through the "*target port*" in one direction

As discussed at [1.3], Feroz and Riddle render obvious having separate partitions for inbound and outbound bandwidth allocations. Ex.1006, 6:58-61; Ex.1005, 14:16-18. This would be appropriate for a network interface that supports full-duplex communication, where transmission and reception of data can occur independently (and simultaneously). Ex.1003, ¶122.

Riddle indicates that two such partitions—one for inbound traffic and one for outbound traffic—exist "at the highest level." Ex.1006, 6:58-61. Thus, they are each similar to the single-partition example discussed immediately above, in that the corresponding "*proportional*" allocation for the inbound partition would be 100% of the available data reception bandwidth, since there are no other partitions with which the inbound partition shares any bandwidth. Ex.1003, ¶¶123-124. Similarly, the corresponding "*proportional*" allocation for the outbound partition

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

would be 100% of the available data transmission bandwidth, since there are no other partitions with which the outbound partition shares any bandwidth. Ex.1003, ¶124.

### "*proportional*": Bandwidth control for a group of data flows flowing through the "*target port*"

As discussed at [1.3], Feroz and Riddle render obvious having separate partitions for different types of traffic. In this situation, "**the fair share of the bandwidth a given partition node is allocated** from a parent partition **relative to its sibling partition nodes**." Ex.1005, 14:63-67. Feroz illustrates an example assignment of weights to partitions in Fig. 9A:



**Ex.1005, Fig. 9A.**

As Fig. 9A shows, the root partition node has an available bandwidth of

1 Mbps. Using Feroz's fair share bandwidth allocation formula, the partition A is assigned a bandwidth of:

$$Root\ bandwidth * \frac{Weight\ of\ Partition\ A}{Weight\ of\ Partition\ A + Weight\ of\ Partition\ B}$$

$$= 1\text{Mbps} * \frac{20}{20 + 30}$$

$$= 0.4\ \text{Mbps} = 400\ \text{Kbps}$$

Ex.1003, ¶126.

Thus, partition A is assigned a fair share bandwidth allocation that is proportional to the weight assigned to partition A. Feroz provides the following table with "the bandwidth allocations resulting from application of the foregoing fair share algorithms to the configuration illustrated in FIG. 9A":

TABLE 1

| Partition | Weighted Fair share |
|-----------|---------------------|
| A | 400K |
| C | 80K |
| D | 320K |
| B | 600K |

Ex.1005, 15:15-26.

By allocating fair share bandwidth from a root partition to a child partition relative to weights assigned to the child partition and its siblings, Feroz renders obvious "*the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element.*" Ex.1003, ¶¶127-128.

**"*proportional*": Bandwidth control for an individual data flow through the "*target port*"**

As discussed at [1.3], Feroz and Riddle render obvious determining a fair-share bandwidth allocation for an individual data flow. This calculation occurs as part of Feroz's Fig. 4B process, specifically, at step 330:



**Ex.1005, Fig. 4B (partial).**

> As FIG. 4B illustrates, the per-flow fair share bandwidth allocation is the current aggregate bandwidth allocated to the partition divided by the number of active flows (330).

Ex.1005, 20:9-11.

Thus, Feroz teaches that the per-flow fair share bandwidth allocation is "*proportional*" to the number of active flows within a given partition. The per-flow fair share bandwidth allocation is also based on the "current aggregate bandwidth allocated to the partition," which represents a "*total bandwidth*" allocated for the partition. Thus, Feroz's per-flow fair share bandwidth allocation renders obvious "*the fair-share bandwidth allocation being a proportional*

*allocation of a total bandwidth of the network switching element*" as claimed.

Ex.1003, ¶¶129-130.

**[1.5]** *adjusting, by the network switching element, the bandwidth allocation for the target port based on the fair-share bandwidth allocation.*

As discussed for limitation [1.2], Feroz describes computing a target rate for a data flow, which corresponds to the claimed "*bandwidth allocation for the target port.*" And as discussed for limitation [1.4], Feroz describes computing a fair share bandwidth allocation for a partition, which corresponds to the claimed "*fair-share bandwidth allocation*" under any of a variety of mappings and interpretations.

Feroz further describes "*adjusting*" the target rate for each flow as part of an iterative process:

> This **per-flow target rate may be limited or adjusted** by a per-flow rate policy configured by a user.

Ex.1005, 4:27-29.

After computing the fair share bandwidth allocation, Feroz describes adjusting the actual bandwidth allocations (i.e., per-flow target rates) based on observed bandwidth demands. First, flow control module 94 determines an amount of unused fair share allocation (if any) for a partition. It would have been obvious to a POSITA that the amount of unused fair share allocation for a partition would be "*based on the fair-share bandwidth allocation*" for the partition, computed as discussed above for limitation [1.3]-[1.4]. Ex.1003, ¶¶133-134. Flow control

module 94 then reallocates that unused bandwidth to one or more other partitions, providing them with an "excess bandwidth allocation":

> FIGS. 8A and 8B together illustrate a method…. In one implementation, flow control module 94 traverses the hierarchical partition configuration (402), starting at the leaf nodes, to **compute the un-utilized fair share** (UFS) and compensation demand (CD) for each partition node….

Ex.1005, 22:24-33.

> Flow control module 94, in one implementation, then computes the excess bandwidth available for distribution. Flow control module 94, starting at the root level in the partition configuration hierarchy (420), **computes the excess band width allocation available for distribution** to child partitions for all non-leaf partitions in that current level (422). As FIG. 8B illustrates, if the aggregate compensation demand (CD) is less than the aggregate unutilized fair share (UFS) (424), flow control module 94 **sets the excess bandwidth allocation (BW) for the partition** node to the aggregate compensation demand (426) and sets the partition satisfaction ratio to one, since the excess bandwidth allocation (BW) is equal to the   compensation demand (CD) for the partition.

Ex.1005, 22:53-65; *see generally* Ex.1005, Figs. 8A and 8B, 22:24-23:15

(describing in full a method for reallocating unused bandwidth toward partitions

with unmet bandwidth demands).

That excess bandwidth allocation for a partition is then allocated down to

individual data flows within the partition by the process described in Fig. 4B.

Specifically, the excess bandwidth allocation becomes part of the "current

aggregate bandwidth allocated to the partition" that is used to compute a per-flow

fair share allocation in Fig. 4B at step 330. Ex.1005, 20:9-11; *see also* Ex.1005,

22:24-28 ("FIGS. 8A and 8B together illustrate a method… directed to computing

aggregate bandwidth allocations across partitions…"); 16:22-27 ("…excess

bandwidth… is redistributed… resulting in an aggregate bandwidth allocation…");

Ex.1003, ¶134. The per-flow fair share allocation from step 330 is then used in

multiple other steps of Fig. 4B to calculate a per-flow target rate, as discussed

previously regarding limitation [1.2]. *See* Fig. 4B, steps 334, 340, 349. Since the

Fig. 4B process is performed periodically (see discussion at [1.2]), the second and

subsequent iterations through the Fig. 4B process for a given data flow render

obvious "*adjusting*" the per-flow target rate. As discussed at [1.2], the per-flow

target rate is "*the bandwidth allocation [for the target port]*." Thus, Feroz renders

obvious "*adjusting… the bandwidth allocation*" as claimed. Ex.1003, ¶135.

Since the excess bandwidth allocation for a partition is determined from an

amount of unutilized fair share bandwidth, the reallocation is performed "*based on
the fair-share bandwidth allocation.*" Ex.1003, ¶136.

As discussed at [1.0], Feroz's application traffic management device 130
corresponds to the claimed "*network switching element.*" The bandwidth
reallocation process discussed above is performed by the flow control module 94,
which is part of application traffic management device 130. Ex.1005, 19:10-12
("parameters used by **flow control module 94 to dynamically adjust** aggregate
and **per-flow bandwidth allocations**"), 6:4-6 & 6:51-52, Fig. 2. Thus, Feroz
renders obvious that the "*adjusting*" step is performed "*by the network switching
element*" as claimed. Ex.1003, ¶137-138.

### 5.    Claim 17

Claim 17 recites substantially the same subject matter as claim 1, except in
the form of an apparatus claim. Ex.1002, 49. Claim 17 is therefore rendered
obvious by the prior art for the same reasons discussed above regarding claim 1.
Ex.1003, ¶139. Nevertheless, the minor wording differences present in claim 17
are analyzed in detail below.

**[17.0] *An edge switch for adjusting bandwidth allocation in a communications
network, the edge switch including a target port, the edge switch configured to:***

As discussed above at [1.0], Feroz's application traffic management device
130 renders obvious a "*network switching element.*" For similar reasons, Feroz's

application traffic management device 130 renders obvious an "*edge switch*" as recited in claim 17. Feroz explains that "application traffic management device 130, in one implementation, is deployed **at the edge of network 40**." Ex.1005, 5:62-64. It would have been obvious to a POSITA for application traffic management device 130 to be an "*edge switch*" because it performs switching (as discussed for limitation [1.0]) and is located at the edge of a network. Ex.1003, ¶¶141-142.

Each stanza in claim 1 recites that the corresponding step is performed "*by the network switching element*," and as discussed above for claim 1, it would have been obvious to a POSITA for Feroz's application traffic management device 130 to perform those steps. For the same reasons, it would have been obvious to a POSITA for Feroz's application traffic management device 130 to be "*configured to*" perform the steps recited in claim 17. Ex.1003, ¶143. For example, Feroz describes an application process 75 within the application traffic management device 130 that includes "one or more software modules implementing the functions performed by application traffic management device 130." Ex.1005, 6:16-18. Feroz also explains that application traffic management device 130 is configurable. *See* Ex.1005, 11:45-46 ("Application traffic management device 130 can be configured to…").

The remainder of limitation [17.0] is substantially identical to limitation

[1.0] and would have been obvious to a POSITA for the reasons discussed above.

Ex.1003, ¶144.

**[17.1] *monitor a data flow traversing the target port;***

As discussed above at [1.1], Feroz renders obvious for its application traffic

management device 130 to perform a "*monitoring*" step.

**[17.2] *determine a bandwidth allocation for the target port, the bandwidth
allocation for the target port being a bandwidth that is currently allocated for the
data flow;***

As discussed above at [1.2], Feroz renders obvious for its application traffic

management device 130 to perform a substantially identical "*determining*" step.

**[17.3] *determine a fair-share bandwidth allocation for the target port,***

As discussed above at [1.3], Feroz and Riddle render obvious for its

application traffic management device 130 to perform a substantially identical

"*determining*" step.

**[17.4] *the fair-share bandwidth allocation being a proportional allocation of a
total bandwidth of the network switching element; and***

As discussed above at [1.4], Feroz and Riddle render obvious the identical

limitation recited in claim 1.

The recitation of "*the network switching element*" in claim 17 has no

antecedent basis. To the extent that this phrase is interpreted as referring to the

"*edge switch*" recited in [17.0], this limitation overall remains obvious for the

reasons discussed at [1.4], since the "*edge switch*" in claim 17 and the "*network
switching element*" in claim 1 both correspond to the application traffic
management device 130 in Feroz. Ex.1003, ¶148.

**[17.5]** *adjust the bandwidth allocation for the target port based on the fair-share
bandwidth allocation.*

As discussed above at [1.5], Feroz renders obvious for its application traffic
management device 130 to perform a substantially identical "*adjusting*" step.

### D.    Grounds 2 & 3

In co-pending litigation, the Patent Owner appears to assert that the '884
patent applies to allocating bandwidth entirely within a network device, such as
allocating bandwidth available for traffic to transit a crossbar or backplane. If
Patent Owner argues to limit the claim language to such a scenario, the Challenged
Claims remain unpatentable because network switching devices were known to use
bandwidth allocation techniques internally.

### 1.    Summary of Petersen

Petersen describes managing access to a "shared resource within a network
switching system" so as "not [to] exceed the capacity of the shared resource."
Ex.1008, Abstract. The shared resource may be, for example, a "switch fabric
device, crossbar switch, shared memory switch or other device" that facilitates
moving packets from an ingress to an egress. Ex.1008, [0033]. When there are

multiple data flows competing for access to the shared resource, Petersen describes
how the flows "may share fairly the available capacity of the shared resource."
Ex.1008, [0110].

### 2.    Summary of Palacharla

Palacharla describes the use of "flexible virtual queues" to facilitate the
transmission of packets from an input port to an output port. Ex.1009, Abstract,
[0018]-[0023]. The flexible virtual queues provide a memory-efficient way to
provide for "queuing packets in per-flow queues" that "may be dynamically
configured." Ex.1009, [0004], [0006], [0036]. For example, Palacharla allows
"flows to be configured" for "any specific combination" of flow parameters.
Ex.1009, [0032].

### 3.    Reasons to combine (Ground 3)

Petersen describes various configurations of its virtual output queues
(VOQs). For example, "there may be one VOQ in an ingress device per
destination," such as one queue per "egress port." Ex.1008, [0036]. There may also
be a "traffic priority (or traffic class) for each queue." Ex.1008, [0104]. Petersen
explains, however, that these arrangements are "merely some example system
configurations" and that other configurations may be used. Ex.1008, [0033].

To that end, Palacharla describes other known configurations of virtual
output queues (VOQs). Many switches, for example, were known to use a "large

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

number of virtual output queues (VOQs)… by queuing packets in per-flow

queues." Ex.1009, [0004].

It would have been obvious to implement per-flow queues, as taught by

Palacharla, in Petersen's network switching system for multiple reasons. Ex.1003,

¶154.

First, Palacharla explains that per-flow queues are used in "many switches."

Ex.1009, [0004]. Using per-flow queues in Petersen would have been obvious

because the use of per-flow queues was "prevalent" in the industry. *See Randall*

*Mfg. v. Rea*, 733 F.3d 1355, 1363 (Fed. Cir. 2013); Ex.1003, ¶¶155-156.

Second, Palacharla explains that "certain ports on a switch, a non-blocking

port configuration may be beneficial." Ex.1009, [0003]. Petersen recognized the

value of avoiding "head of line blocking." Ex.1008, [0036]. Since traditional

approaches of providing "non-blocking flows quickly become[] expensive," a

POSITA would have found it obvious to employ Palacharla's memory-efficient

non-blocking queues to Petersen's network switching system. Ex.1009, [0005];

Ex.1003, ¶157.

Third, Petersen describes its virtual output queues (VOQs) at a high level. A

POSITA implementing Petersen's queues would have found it obvious, therefore,

to consult other references, such as Palacharla, that provide more details regarding

the implementing of virtual output queues (VOQs). Ex.1003, ¶158; *see, e.g.,*

Ex.1009, Figs. 3-4 and associated descriptions.

Fourth, the combination is merely the simple substitution of one known element (Petersen's queues) for another (Palacharla's flexible queues) to obtain predictable results (memory-efficient, per-flow queueing of packets). Ex.1003, ¶159.

Fifth, the combination is merely the use of a known technique (Palacharla's per-flow queueing) to improve a similar device (Petersen's network switching system) in the same way (providing non-blocking data flows and reducing memory consumption). Ex.1003, ¶160.

Further reasons and analysis of the Petersen-Palacharla combination are provided in the detailed claim analysis below.

### 4. Claim 1

**[1.0] *A method of adjusting bandwidth allocation by a network switching element in a communications network, the network switching element including a target port, the method comprising:***

Petersen illustrates a "network switching system" in Fig. 1, below. Ex.1008, [0024].  The network switching system includes "network devices 102, 104, etc." that represent "switches, routers, line cards, or other network devices." Ex.1008, [0024]. Each network device includes "one or more network ports," each of which "act as an input (or ingress) port or an output ( or egress) port." Ex.1008, [0024], [0002], [0027]. Thus, Petersen's network switching system is a *network switching*

*element*." Ex.1003, ¶¶162-164. Petersen's Fig. 1 shows that connections from the various network ports extend out from the network switching system, but the opposite ends of those connections are not shown. It would have been obvious to a POSITA that the network switching system 100 is part of a larger network including other network devices such as switches, routers, and computers, collectively corresponding to the claimed "*communications network*." Ex.1003, ¶165. Any of the ports on Petersen's network switching system, such as an egress port, corresponds to the claimed "*target port*." Ex.1003, ¶166.



**Ex.1003, ¶164; Ex.1008, Fig. 1 (annotated).**

Petersen explains that its network devices dynamically "adjust their behavior or allocation" of bandwidth in response network conditions, for example, adjusting their "data transmission rates." Ex.1008, [0107]; *see also id.*, claim 18 ("adjusting a transmission rate… to provide an… allocation of bandwidth"). Petersen describes "allocation algorithms" to achieve this functionality. Ex.1008, [0109]-[0110]. For example, Petersen describes allocating "a fair portion (or other amount) of the bandwidth or traffic (e.g., bit rate) capacity, such as approximately $1/N^{th}$ of the bandwidth" available. Ex.1008, [0023]; *see also id.*, [0116]-[0122] (describing various embodiments for sharing the capacity of a limited bandwidth resource), Fig. 10 (showing "a flow chart illustrating operation," [0118]).

Petersen's discussion of adjusting data transmission rates renders obvious the claimed "*method of adjusting bandwidth allocation.*" Ex.1003, ¶167.

**[1.1]** *monitoring, by the network switching element, a data flow traversing the target port of the network switching element;*

Petersen explains that an ingress port identifies packets in a flow and adds a flow header to facilitate the transmission of packets across the network switching system. The flow represents a group of related packets, for example, packets that are all directed to a same destination (e.g., to the same egress port):

> [0047] FIG. 6 is a diagram illustrating several examples of a header set 600 that may be used by a network

switching system according to an example embodiment….

[0049] … A third fabric header set 606 illustrates an example header set that may be assembled when two network switches or two network processors are exchanging packets within the network switching system, e.g., across one or more intermediary devices. The header set 606 may include, for example, a **flow field identifying a flow (or group of associated fabric packets)**, a format field to identify a format for the fabric packet, and one or more processing parameters….

[0078] A flow header may also be used to identify a flow for the current packet. **A flow may be, for example, a group of related packets, or one or more packets from a same source or application, and/or directed to a same destination**…. Other types of flows may be used as well.

Ex.1008, [0047], [0049], [0078].

Petersen further explains that the ingress port then places the packet into a virtual output queue (VOQ). *See* Ex.1008, [0036]; Ex.1003, ¶174. Petersen explains that at the ingress port, there is one queue for each egress port:

There may be, for example, **one virtual output queue (VOQ) at an ingress network device storing cells or packets to be transmitted to each destination**…. **A**

> **destination may include**, for example, within a network switching system, an egress device, a port or physical port (e.g., **egress port**) of an egress device, a virtual port of an egress device, etc.

Ex.1008, [0036].

The ingress port monitors the queue and reports its status (e.g., how full the queue is) to other components in the network switching system:

> [0022] … The queue state messages may indicate, for example, a **queue state (e.g., an empty/non-empty state or a level of fullness of the queue**….
>
> [0023] Thus, for example, by **exchanging queue state information between network devices** in a network switching system, congestion in the switching system may be avoided in some cases (e.g., anticipated and transmission rates adjusted to avoid congestion)….

Ex.1008, [0022]-[0023]; *see also* Ex.1008, [0083]-[0086] (describing "queue state message 810" that "may be transmitted (e.g., to other devices in the network switching system)").

By identifying and marking packets destined for a single egress port as a flow, placing them in a queue, and monitoring the queue status, Petersen renders obvious "*monitoring, by the network switching element, a data flow traversing the target port*…." Ex.1003, ¶¶170-176.

**Ground 3:**  To the extent that Patent Owner argues that Petersen's disclosure of "*monitoring*" is insufficient because "*data flow*" has some particularized meaning,[2] it would have been obvious to implement Petersen's system to have a separate VOQ for each flow (however defined). Ex.1003, ¶177. Such architectures were well-known in the art. For example, Palacharla explains that "many switches" use per-flow queueing:

> To accomplish non-blocking operation in a switch, **many switches incorporate** a large number of virtual output queues (VOQs) for each non-blocking flow supported by the switching fabric. Such virtual output queues eliminate head of-line blocking by **queuing packets in per-flow queues** (i.e., separate queues for each combination of non-blocking input port, output port, and service level).

Ex.1009, [0004].

It would have been obvious to a POSITA to combine the features of Petersen and Palacharla because the use of individual packet queues for each packet flow

---

[2] For example, Patent Owner may argue for "*data flow*" to refer to a Data Center TCP connection. *See, e.g.*, Ex.1001, 1:36-41.  From there, Patent Owner may argue that Petersen's architecture would commingle packets from multiple "*data flows*" (per a Patent Owner definition) in a single queue, and thus, that Petersen's monitoring of queue status is allegedly not "*monitoring*" a "*data flow*."

was common in switch designs. Ex.1003, ¶178; *see, e.g.*, Ex.1047, [0032]

("packets are first enqueued on a per-flow queue."); Ex.1048, 3:19-20 ("Each flow

(local input flow and transit flow) has a corresponding 'virtual' queue…"). A

POSITA would have had a reasonable expectation of success in the combination

because Petersen is flexible and open-ended regarding both the number and

organization of its VOQs. *See* Ex.1008, [0036]-[0037], [0033], [0110]; Ex.1003,

¶178.

A POSITA also would have had a reasonable expectation of success in the

combination because Petersen is flexible regarding how packets are aggregated

into flows. Ex.1003, ¶178; Ex.1008, [0078] ("Other types of flows may be used as

well.").

In summary, by monitoring the queue of packets for a flow toward an egress

port of the network switching system, the combination of Petersen and Palacharla

also renders obvious "*monitoring, by the network switching element, a data flow

traversing the target port of the network switching element.*" Ex.1003, ¶179.

**[1.2] *determining, by the network switching element, a bandwidth allocation for
the target port, the bandwidth allocation for the target port being a bandwidth
that is currently allocated for the data flow;***

Petersen renders this limitation obvious by describing how ingress ports

respond to updated queue state information to adjust their transmission rates.

Ex.1003, ¶¶180-181; Ex.1008, [0022]-[0023]. For example, Petersen describes

allocating more capacity (bandwidth), and even all possible bandwidth, to a single high-priority queue (VOQ) when there are no other high-priority queues with packets to send:

> The ingress device may allocate more (or even all) of the resource (e.g., larger percentage of available bit rate of shared segment) to the high priority VOQ…. **A VOQ having higher priority traffic may be allocated a higher portion of the capacity or bit rate of the shared segment or resource**. Therefore, according to an example embodiment, a disproportionate amount of the traffic capacity of a resource may be allocated or available to high priority traffic, as compared to lower priority traffic…. **If there is only one high priority VOQ, that VOQ may claim or use all of the capacity** or a higher percentage of the capacity than the lower priority traffic VOQs, for example.

Ex.1008, [0110].

In this situation where a single queue is allowed to "use all of the capacity," it would have been obvious to a POSITA for the ingress port to have "*determin[ed]… a bandwidth allocation*" equal to the "capacity" of the shared resource. Ex.1003, ¶182. As discussed at [1.0], Petersen's ports are part of its network switching system, which corresponds to the claimed "*network switching element*." Thus, Petersen teaches that bandwidth allocations are determined "*by the*

*network switching element*." Ex.1003, ¶182.

As discussed at [1.1], Petersen describes "an association between a virtual output queue (VOQ) and a destination," such as an egress port. Ex.1008, [0036]; *see also id.*, [0037] ("all **transmitting to the same destination (e.g., a same port or a same egress device)**."), [0045] ("**one VOQ being associated with each destination (e.g., an egress device, an egress port or virtual port of an egress device** within a network switching system)"), [0119]. Thus, the allocation "all of the capacity" to a queue corresponding to an egress port is a "*bandwidth allocation for the target port*" as claimed. Ex.1003, ¶182.

It would have been obvious to a POSITA for Petersen's bandwidth allocation for a queue to be that "*currently allocated for the data flow*." Ex.1003, ¶183. For example, Petersen explains that queue state information is regularly exchanged among ports within the network switching system, for example, whenever "a change in a queue state occurs." Ex.1008, [0086]. Upon receipt of updated queue state information from other ports, an ingress port recomputes its bandwidth allocations so that it may responsively "adjust a transmission rate." Ex.1008, [0008], [0022]-[0023], [0118]-[0121], Fig. 10; Ex.1003, ¶183. Petersen therefore renders obvious for an ingress port's bandwidth allocations to be updated regularly, such that the ingress port's bandwidth allocations for packets destined for a particular egress port (e.g., a "*data flow*") are kept "*current*[]." Ex.1003,

¶¶184-185.

**Ground 3:** As discussed at [1.2], Petersen and Palacharla render obvious implementing per-flow queues, such that each queue contains only packets from a single "*data flow*." By teaching that one high-priority queue (corresponding to one "*data flow*") is currently entitled to "claim or use all of the capacity" toward an egress port (Ex.1008, [0110]), the combination renders obvious "*determining… a bandwidth allocation for the target port being a bandwidth that is currently allocated for the data flow*." Ex.1003, ¶186.

**[1.3] *determining, by the network switching element, a fair-share bandwidth allocation for the target port,***

Petersen describes allocating a fair-share bandwidth among multiple queues that all desire to transmit to the same destination, such as an egress port ("*the target port*"):

> Based on this global demand of a shared resource, each network device may, for example, adjust a transmission rate for one or more of its active VOQs that are using the resource to use up to, for example, approximately **a fair portion (or other amount) of the bandwidth** or traffic (e.g., bit rate) capacity, such as approximately $1/N^{th}$ of the bandwidth or traffic capacity for the shared resource for N VOQs sharing the resource, according to an example embodiment.

Ex.1008, [0023].

> For example, the ingress devices may **adjust the transmission rate for each VOQ to a fair portion of the capacity of the shared resource**, or l/Nth of the capacity, where N maybe the total number of VOQs sharing the resource (N=2 in this example). In this example, N=2, and the capacity of the path segment is 18 Gbps. Therefore, ingress devices 1 and 2 may adjust the traffic rate from VOQs 902 and 904, respectively, to 9 Gbps each, as shown in FIG. 9A.

Ex.1008, [0097]; *see also id.* [0121].

Petersen's disclosure of adjusting a transmission rate of packets toward an egress port to be a "fair share" of the available bandwidth renders obvious "*determining, by the network switching element, a fair-share bandwidth allocation for the target port*." Ex.1003, ¶¶187-188.

**[1.4] *the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element; and***

As discussed at [1.4], Petersen describes calculating a "fair share" allocation of available bandwidth among multiple queues that are transmitting to a same destination, such as an egress port. Petersen's disclosure that the fair share represents "1/Nth" of the capacity of a shared resource renders obvious "*fair-share bandwidth allocation being a proportional allocation*." Ex.1008, [0093], [0097],

[0111], [0117], [0122]; Ex.1003, ¶¶189-190.

The capacity of a shared resource is a "*total bandwidth of the network switching element*." As discussed at [1.0], Petersen's network switching system corresponds to the claimed "*network switching element*." Petersen describes an example allocation for the network switching system shown in Fig. 9A, where the total bandwidth capacity of segment 907 is 18 Gbps. Ex.1008, [0096]; *see also id.*, [0019]. That total bandwidth capacity is shared between two ingress devices transmitting packets to an egress port (element 910). Each ingress device desires to transmit at 30Gbps. Ex.1008, [0097].



**Ex.1003, ¶191; Ex.1008, Fig. 9A (annotated).**

Petersen explains that in this situation, the ingress devices would allocate the 18Gbps of available bandwidth between themselves by sharing it equally, meaning that each of virtual output queues (VOQs) 901 and 902 is allocated 9 Gbps of

bandwidth:

> Based on the offered traffic load of two active VOQs and a capacity of segment 907 of 18 Gbps, ingress devices 1 and 2 may adjust or decrease the transmission rate or traffic load from VOQs 902 and 904, respectively. For example, the ingress devices may adjust the transmission rate for each VOQ to a fair portion of the capacity of the shared resource, or l/Nth of the capacity, where N maybe the total number of VOQs sharing the resource (N=2 in this example). In this example, N=2, and the capacity of the path segment is 18 Gbps. Therefore, ingress devices 1 and 2 may **adjust the traffic rate from VOQs 902 and 904, respectively, to 9 Gbps each**, as shown in FIG. 9A.

Ex.1008, [0097]; *see also id.*, [0121].

By fairly sharing the available bandwidth such that each of the two devices receives one-half of the available bandwidth, Petersen renders obvious "*the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element*." Ex.1003, ¶¶191-193.

**[1.5]** ***adjusting, by the network switching element, the bandwidth allocation for the target port based on the fair-share bandwidth allocation.***

As discussed at [1.3]-[1.4], Petersen renders obvious determining a fair-share portion of bandwidth. Petersen further describes "adjusting" bandwidth allocations to match the determined fair-share bandwidth:

> For example, the ingress devices may **adjust the
> transmission rate for each VOQ to a fair portion** of
> the capacity of the shared resource, or l/Nth of the
> capacity, where N maybe the total number of VOQs
> sharing the resource (N=2 in this example). Therefore,
> ingress devices 1 and 2 may adjust the traffic rate from
> VOQs 902 and 904, respectively, to 9 Gbps each, as
> shown in FIG. 9A.

Ex.1008, [0097]; *see also id.*, [0023].

For example, as discussed at [1.4], Petersen describes using Fig. 9A an
example in which two ingress ports equally share the 18 Gbps of available
bandwidth toward an egress port. Ex.1008, [0097]. Thus, the "fair-share"
bandwidth for each ingress port is 9 Gbps. *See, supra*, [1.4]. By adjusting the
ingress ports' transmission rates to use that "fair-share" bandwidth of 9 Gbps
(Ex.1008, [0097]), Petersen renders obvious "*adjusting, by the network switching
element, the bandwidth allocation for the target port based on the fair-share
bandwidth allocation*." Ex.1003, ¶194-196.

### 5. Claim 17

Claim 17 recites substantially the same subject matter as claim 1, except in
the form of an apparatus claim. Claim 17 is therefore rendered obvious by the prior
art for the same reasons discussed above regarding claim 1. Ex.1003, ¶197.
Nevertheless, the minor wording differences present in claim 17 are analyzed in

detail below.

**[17.0]** *An edge switch for adjusting bandwidth allocation in a communications network, the edge switch including a target port, the edge switch configured to:*

As discussed above at [1.0], Petersen describes a network switching system in a "*communications network*" and "*including a target port.*"

It would have been obvious to a POSITA for Petersen's network switching system to be an "*edge switch*" as claimed because Petersen contemplates arranging network components "in a variety of arrangements." Ex.1008, [0003]; *see also id.*, [0033] ("…many other types or configurations of network switching systems may be used."); Ex.1003, ¶199. Additionally, it was well-known in the art to arrange network components such that a switch would act as an edge switch. Material Fact #14. Thus, Petersen's network switching system renders obvious the claimed "*edge switch.*" Ex.1003, ¶199. As discussed for claim 1 and further below, it would have been obvious for Petersen's network switching system to be "*configured to*" perform the recited steps. Ex.1003, ¶200.

**[17.1]** *monitor a data flow traversing the target port;*

As discussed above at [1.1], Petersen, alone or in combination with Palacharla, renders obvious "*monitoring… a data flow traversing the target port.*"

**[17.2]** *determine a bandwidth allocation for the target port, the bandwidth allocation for the target port being a bandwidth that is currently allocated for the data flow;*

As discussed above at [1.2], Petersen renders obvious for a network switching system to perform a substantially identical "*determining*" step.

**[17.3] *determine a fair-share bandwidth allocation for the target port,***

As discussed above at [1.3], Petersen renders obvious for a network switching system to perform a substantially identical "*determining*" step.

**[17.4] *the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element; and***

As discussed above at [1.4], Petersen renders obvious the identical limitation recited in claim 1.

The recitation of "*the network switching element*" in claim 17 has no antecedent basis. To the extent that this phrase is interpreted as referring to the "*edge switch*" recited in [17.0], this limitation overall remains obvious for the reasons discussed at [1.4], since the "*edge switch*" in claim 17 and the "*network switching element*" in claim 1 both correspond to the network switching system in Petersen. Ex.1003, ¶204.

**[17.5] *adjust the bandwidth allocation for the target port based on the fair-share bandwidth allocation.***

As discussed above at [1.5], Petersen renders obvious for a network switching system to perform a substantially identical "*adjusting*" step.

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

## XI.    DISCRETIONARY DENIAL IS INAPPROPRIATE

### A.    No basis for 35 U.S.C. § 325(d) denial

The references presented in this petition have not previously been

considered by the Office with respect to the '884 patent claims. Accordingly,

discretionary denial under 35 U.S.C. § 325(d) is not appropriate.

### B.    Discretionary denial under *Fintiv* is not appropriate.

The six factors considered for § 314 discretionary denial strongly favor

institution given Petitioner's timely filing and the compelling merits of this case.

*See Apple Inc. v. Fintiv, Inc*., IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020)

(precedential).

#### 1.    No evidence regarding a stay

No motion to stay has been filed, so the Board should not infer the outcome

of such a motion. *Sand Revolution II LLC v. Continental Intermodal Group –*

*Trucking LLC*, IPR2019-01393, Paper 24 at 7 (PTAB June 16, 2020)

(informative); *see also Dish Network L.L.C. v. Broadband iTV, Inc.*, IPR2020-

01359, Paper 15 (Feb. 12, 2021). Thus, this factor is neutral.

#### 2.    Parallel proceeding trial date

The co-pending district court case was filed in the Eastern District of Texas

on May 6, 2024. Ex.1012. The most recent statistics currently available for the

Eastern District of Texas show a median time-to-trial of 21.6 months. Ex.1012, 35.

79

Thus, the estimated trial date is late March 2026.[3] The Board's final written

decision is expected shortly afterwards, in July 2026. Given the proximity of the

Board's expected Final Written Decision and the estimated trial date, this factor is

at least neutral. *See e.g., Cisco Systems Inc., v. Video Solutions Pte. Ltd.*, IPR2024-

00194, Paper 7 at 10 (PTAB March 28, 2024) (granting institution and finding

factor two neutral where "trial is likely to begin within approximately one month

of [the Board's] final written decision").

### 3.    Investment in the parallel proceeding

The co-pending litigation is in its early stages, with major activities

including a *Markman* hearing and the close of discovery scheduled after the

Board's expected decision on institution. *See* Ex.1013, 3-4 (Claim Construction

hearing on September 3, 2025; close of fact discovery on October 14, 2025; close

of expert discovery on November 17, 2025). Moreover, Petitioner has acted with

diligence to prepare this Petition after Petitioner was served with a complaint.

Simultaneous with that effort, Petitioner diligently prepared IPR petitions on two

---

[3] The docket control order sets the case for trial on March 2, 2026. Ex.1013, 1.

However, "a court's general ability to set a fast-paced schedule is not particularly

relevant…where, like here, the forum itself has not historically resolved cases so

quickly." *In re Apple Inc*., 979 F.3d 1332, 1344 (Fed. Cir. 2020).

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

other patents asserted in the litigation, plus a third patent that Patent Owner

withdrew from the litigation just as Petitioner was preparing to file an IPR against

it. *See, e.g.*, IPR2025-00188, IPR2025-00241.

Petitioner also expended significant resources attempting to understand

Patent Owner's infringement allegations, including especially those regarding

claims 11 and 20, which recite "an over-subscription ratio, the over-subscription

ratio being a ratio of the bandwidth allocation of the target port to a number of data

flows traversing the target [port]." Ex.1001, 23:42-45, 26:12-16. That definition is

confusingly different from the description of "over-subscription ratio" in the

specification, which does not depend on a number of data flows. *See* Ex.1001,

16:3-10. Ultimately, Petitioner has opted to file this Petition with challenges to

only claims 1 and 17.

### 4.    Overlapping issues with the parallel proceeding

Petitioner also offers the following stipulation to remove the possibility of

overlapping issues: Petitioner stipulates that if trial is instituted, it will not pursue

the same grounds in the district court litigation. *See Sand Revolution II, LLC v.*

*Cont'l Intermodal Group-Trucking LLC,* IPR2019-01393, Paper 24 at 12 (PTAB

June 16, 2020). Consequently, this factor favors institution.

### 5.    Identity of parties

Petitioner is a defendant in the litigation. That is true of most petitioners in IPR proceedings. Accordingly, this factor should not be a basis for denying institution.

### 6.    Other circumstances

The prior art presented in this Petition presents a compelling case on the merits. During prosecution, the claims of the '884 patent were distinguished over other prior art that failed to "monitor data traveling through a [device], itself." Ex.1002, 48.  The prior art from prosecution also failed to "teach regulating a bandwidth for a port" on the device itself. Ex.1002, 48. As explained in detail above, these ideas are disclosed in Feroz and Petersen, neither of which was reviewed in prosecution.

The Board's current policy is to "not deny institution of an IPR or PGR under Fintiv (i) when a petition presents compelling evidence of unpatentability." Director's Memorandum dated June 21, 2022 ("Memo"), 9. "Compelling, meritorious challenges are those in which the evidence, if unrebutted in trial, would plainly lead to a conclusion that one or more claims are unpatentable by a preponderance of the evidence." Memo, 4. Here, the Petition plainly shows that the concepts argued to gain allowance were known in the art.

Thus, the evidence of unpatentability is compelling here, and the PTAB should not deny institution under *Fintiv*.

### C.     Discretionary denial under *General Plastic* is not appropriate

The '884 patent has not been challenged in any prior IPR petition, so none of *General Plastic* discretionary institution factors apply to this Petition. *See General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 16 (Sept. 6, 2016) (Section II.B.4.i. precedential).

## XII.    CONCLUSION

Petitioner has established a reasonable likelihood that the Challenged Claims are unpatentable.

Respectfully submitted,

Dated: January 9, 2025            /Theodore M. Foster/
HAYNES AND BOONE, LLP            Theodore M. Foster
2323 Victory Avenue, Suite 700    Lead Counsel for Petitioner
Dallas, Texas 75219               Registration No. 57,456
Customer No. 27683

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

## XIII. MANDATORY NOTICES

### A.    Real party-in-interest

Pursuant to 37 C.F.R. § 42.8(b)(1), Petitioner certifies that the real party-in-interest is Cisco Systems, Inc.

### B.    Related matters

Pursuant to 37 C.F.R. § 42.8(b)(2), to the best knowledge of the Petitioner, the '884 Patent is or was involved in the following case:

| Case Heading | Number | Court | Filed |
|---|---|---|---|
| *WSOU Investments, LLC v. Cisco Systems, Inc.* | 2-24-cv-00332 | EDTX | May 6, 2024 |

### C.    Lead and back-up counsel and service information

Lead Counsel
Theodore M. Foster                    Phone: (972) 739-8649
HAYNES AND BOONE, LLP                 Fax: (214) 200-0853
2801 N. Harwood St., Suite 2300       ipr.theo.foster@haynesboone.com
Dallas, TX 75201                      USPTO Reg. No. 57,456

Back-up Counsel
David L. McCombs                      Phone: (214) 651-5533
HAYNES AND BOONE, LLP                 Fax: (214) 200-0853
2801 N. Harwood St., Suite 2300       david.mccombs.ipr@haynesboone.com
Dallas, TX 75201                      USPTO Reg. No. 32,271

Brian Kwok                            Phone: (415) 293-8916
HAYNES AND BOONE, LLP                 Fax: (214) 200-0853
2801 N. Harwood St., Suite 2300       brian.kwok.ipr@haynesboone.com
Dallas, TX 75201                      USPTO Reg. No. 58,828

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

Eugene Goryunov
HAYNES AND BOONE, LLP
2801 N. Harwood St., Suite 2300
Dallas, TX 75201

Phone: (312) 216-1630
Fax: (214) 200-0853
eugene.goryunov.ipr@haynesboone.com
USPTO Reg. No. 61,579

Please address all correspondence in this proceeding to lead and back-up

counsel. Petitioner consents to service in this proceeding by email at the addresses

above.

## CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), Petitioner hereby certifies, in accordance with and reliance on the word count provided by the word-processing system used to prepare this Petition, that the number of words in this paper is 13,974. Pursuant to 37 C.F.R. § 42.24(d), this word count excludes the table of contents, table of authorities, mandatory notices under § 42.8, certificate of service, certificate of word count, appendix of exhibits, and any claim listing.

Dated: January 9, 2025

/Theodore M. Foster/
Theodore M. Foster
Lead Counsel for Petitioner
Registration No. 57,456

IPR2025-00429 Petition
*Inter Partes* Review of U.S. 9,450,884

## CERTIFICATE OF SERVICE

The undersigned certifies that, in accordance with 37 C.F.R. § 42.6(e) and

37 C.F.R. § 42.105, service was made on Patent Owner as detailed below.

| | |
|---|---|
| *Date of service* | January 9, 2025 |
| *Manner of service* | FEDERAL EXPRESS |
| *Documents served* | Petition for *Inter Partes* Review Under 35 U.S.C. § 312 and 37 C.F.R. § 42.104 of U.S. 9,450,884; |
| | Petitioner's Power of Attorney; |
| | Petitioner's Exhibit List; |
| | Exhibits 1001-1050. |
| *Persons served* | Etheridge Law Group 2600 East Southlake Blvd., 120-324 Southlake, TX 76092 |

/ Theodore M. Foster /
Theodore M. Foster
Lead Counsel for Petitioner
Registration No. 57,456