

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING & DEVELOPMENT,<br><br>*Plaintiff,*<br><br>v.<br><br>CISCO SYSTEMS, INC.,<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§ Case No. 2:24-CV-00332-RWS-RSP<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## CLAIM CONSTRUCTION ORDER

On October 17, 2025, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 7,386,630 (the "'630 Patent"), U.S. Patent No. 8,982,691 (the "'691 Patent"), U.S. Patent No. 9,450,884 (the "'884 Patent") (collectively, the "Asserted Patents").[1] Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing (Dkt. Nos. 43, 44, 45)[2], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] On December 4, 2025, the parties jointly stipulated to the dismissal of the '691 Patent with prejudice. (Dkt. No. 78). Given the parties' stipulation, the Court will not address the '691 Patent.

[2] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

TABLE OF CONTENTS

CLAIM CONSTRUCTION ORDER.................................................................................................... 1

I.      BACKGROUND .................................................................................................................. 3

II.     APPLICABLE LAW ............................................................................................................ 5

III.    LEVEL OF ORDINARY SKILL IN THE ART ................................................................. 10

IV.     CONSTRUCTION OF AGREED TERMS......................................................................... 11

V.      CONSTRUCTION OF DISPUTED TERMS...................................................................... 11

        A.    "role name"................................................................................................... 12

        B.    "customer policy".......................................................................................... 15

        C.    "an egress interface of one of multi-protocol label switching tunnels"....... 17

        D.    "the interfaces associate with at least one of input roles, output roles, and
              multi-protocol label switching gateways of customer source and destination host
              groups" ........................................................................................................... 19

        E.    "sending the mapping policy to the network interfaces further comprises…"
              21

        F.    "a bandwidth that is currently allocated for [each of] the data flow[s]"...... 23

        G.    "a proportional allocation of a total bandwidth of the network switching
              element" ......................................................................................................... 26

        H.    "the over-subscription ratio being a ratio of the bandwidth allocation of the
              target port to a number of data flows traversing the target p[a/o]rt".................. 27

VI.     CONCLUSION................................................................................................................... 31

### I.    BACKGROUND

Plaintiff Brazos  alleges that Defendant Cisco infringes the Asserted Patents. Shortly before the start of the October 17, 2025 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The '630 Patent, titled "Using Policy-Based Management to Support Diffserv over MPLS Network," was filed on November 21, 2003, and issued on June 10, 2008. The '630 Patent relates "to communication networks, and data packet routing in such networks." '630 Patent at 1:14–15.

The Abstract of the '630 Patent states:

> A policy server operates to configure differentiated services over multi-protocol label switching (Diffserv/MPLS) in a communications network. The policy server enables the definition and deployment of a customer policy, a network policy and a mapping policy. The policy server is arranged to create a group of MPLS tunnels, and associate the tunnels to the mapping policy and the customer policy. The customer policy includes a tunnel group identifier and a tunneling mode, and maps customer traffic to MPLS tunnels. The policy server translates the customer policy, the network policy and the mapping policy into device-specific commands, and then deploys the device-specific commands to the network interfaces of the affected network devices.

Claim 18 of the '630 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 18. A method comprising:
> defining a mapping policy configured to map between an experimental field and a unique per-hop-behavior;
> defining a *customer policy* comprising a tunneling mode and a tunnel group identifier, the *customer policy* being configured to govern the treatment of individual customer traffic;
> defining a network policy that is configured to define the Diffserv treatment of aggregated traffic;
> translating the mapping policy, the network policy and the *customer policy* into device-specific commands; and
> sending the device-specific commands to policy targets, wherein each policy target comprises a network device that includes an interface assigned a *role name* associated with the *customer*

*policy*, at least one of the interfaces comprising *an egress interface of one of multi-protocol label switching tunnels*.

The '884 Patent, titled "Software Defined Networking Based Congestion Control," was filed on June 11, 2014, and issued on September 20, 2016. The '884 Patent relates to "a method for adjusting bandwidth allocation by a network element in a communications network." '884 Patent at 1:45–47.

The Abstract of the '884 Patent states:

> Methods and systems of adjusting bandwidth allocation by a network element in a communications network includes monitoring a data flow traversing a target port, determining a bandwidth allocation for the target port, determining a fair-share bandwidth allocation for the target port, and adjusting the bandwidth allocation for the target port based on the fair-share bandwidth allocation. The bandwidth allocation for the target port is a bandwidth that is currently allocated for the data flow. The fair-share bandwidth allocation is a proportional allocation of a total bandwidth of the network element.

Claim 1 of the '884 Patent is an illustrative claim and recites the following elements (disputed terms in italic):

> 1. A method of adjusting bandwidth allocation by a network switching element in a communications network, the network switching element including a target port, the method comprising:
> monitoring, by the network switching element, a data flow traversing the target port of the network switching element;
> determining, by the network switching element, a bandwidth allocation for the target port, the bandwidth allocation for the target port being *a bandwidth that is currently allocated for the data flow*;
> determining, by the network switching element, a fair-share bandwidth allocation for the target port, the fair-share bandwidth allocation being *a proportional allocation of a total bandwidth of the network switching element*; and
> adjusting, by the network switching element, the bandwidth allocation for the target port based on the fair-share bandwidth allocation.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because

claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims

absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871)

(a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

### B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[3] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366

---

[3] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

### III.    LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

For the '630 Patent, Plaintiff argues that a POSITA "would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or an equivalent, and approximately two years of professional experience working in the field of network communications and would be knowledgeable regarding packet-based computer networking." (Dkt. No. 43 at 7). For the '884 Patent, Plaintiff argues that a POSITA would have "at least a bachelor's degree in computer science, computer engineering, electric engineering, or an equivalent, and approximately two years of experience working in the field of network communications and would be knowledgeable regarding network switching operations. *Id.* at 8. For both Asserted Patents, Plaintiff argues that a POSITA alternatively "may have additional years of practical and relevant work or research experience as substitution for less or different technical

education, and vice versa." *Id.* at 7-8. Defendant did not provide requirements for a POSITA.

Having considered Plaintiff's proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds a POSITA would have at least a bachelor's degree in computer science, computer engineering, electric engineering, or an equivalent, and approximately two years of experience working in the field of network communications. Additional education may substitute for industry experience, or vice versa.

### IV.    CONSTRUCTION OF AGREED TERMS

The Parties agreed to the construction of the following claim terms:

| Claim Term/Phrase | Agreed Construction |
| --- | --- |
| "tunnel group identifier" ('630 Patent, Claim 18) | "a single identifier for a set of tunnels that share the same properties and form a certain topology" |
| "policy targets" ('630 Patent, Claims 4, 10, 12, 18) | Plain and ordinary meaning. |
| "end-to-end path of said Bypass LSP" ('691 Patent, Claims 1, 5, 6, 10) | "all nodes traversed, inclusive of the Bypass LSP" |
| "data flow[s] traversing [of] the target port" ('884 Patent, Claims 1, 11, 17, 20) | Plain and ordinary meaning. |

Dkt. No. 46-1 at 2-18 (P.R. 4-5(d) Joint Claim Construction Chart). In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

### V.    CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of eight terms or phrases in the Asserted Patents. Each dispute is addressed below.

### A. "role name"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
| --- | --- | --- |
| "role name" | Plain and Ordinary Meaning. | "a name (distinct from an interface identifier) that is assigned to interfaces that will get the same set of rules or policies" |

### 1. Analysis

The term "role name" appears in Asserted Claim 18 of the '630 Patent. The parties dispute whether the term "role name" requires construction. Plaintiff argues that Defendant inserts an unsupported negative limitation into the claim (*i.e.*, "distinct from an interface identifier"). Plaintiff further argues that the patentees did not define "role name," and Defendant's construction turns two words into twenty-two that would serve only to confuse the jury without adding clarity.

The Court notes that the specification discloses a method of configuring differentiated services over multi-protocol label switching (Diffserv/MPLS) in a communications network. '630 Patent at Abstract. To that end, the specification discloses embodiments describing packet-forwarding policies designed to administer, manage, and control access to network resources. *Id.* at 4:19–31. The specification states that "in a large network, the same set of policies can be applied to multiple routers or network interfaces." *Id.* at 6:19–20. The specification further states that "*[t]o achieve better scalability*, network interfaces are assigned role names and the policies are specified and associated with the roles name." *Id.* at 6:20–22. Similarly, the specification states that "[i]nterfaces with the same role names will get the same set of rules or policies." *Id.* at 4:60-61.

During prosecution, the patentees further clarified that the term "role name" should be "understood in view of the specification." (Dkt. No. 44-2 at 203). To overcome a rejection based on the prior art Basso, the patentees explained that the examiner "[did] not identify an element of Basso that corresponds to a role name" because the claims require that "[i]nterfaces with the same

Page 12 of 31

role names will get the same set of rules or policies." *Id.* Specifically, the patentees argued the following:

> The [examiner] cites paragraphs 28-32 and 42, but does not identify an element of Basso that corresponds to a role name. Applicants find none. The claim terms are understood in view of the specification, which explains that "network interfaces are arranged to have assigned role names. *Interfaces with the same role names will get the same set of rules or policies.* Each role name is then associated with a network policy and a customer policy." (Spec., pg. 7, lines 5-8.) Applicants are not importing limitations from specification. It is well established that the claims terms are understood in view of the specification.

*Id.* (emphasis added). Likewise, in response to a subsequent rejection based on Edmondson, the patentees reiterated "according to the presently claimed invention, the role names are such that interfaces with the same role names will get the same set of rules and policies." *Id.* at 236. Thus, the intrinsic evidence indicates that a "role name" is "a name associated with a set of rules or policies."

Defendant contends that its construction is reflected in the provisional application and in the specification. (Dkt. No. 44 at 9-11) (citing Dkt. No. 44-1 at 6-7; '630 Patent at 4:59–63, 6:19–24). Defendant further contends that the provisional application differentiates between a role name and interface identifier. (Dkt. No. 44 at 9) (citing Dkt. No. 44-1 at 57-59). Defendant also argues that Claim 18 reflects the two key characteristics of "role name" that are reflected in its construction. (Dkt. No. 44 at 9).

Defendant argues that if "role name" were merely an interface's identifier, then the role name would be assigned to only one interface. *Id.* at 10. Defendant contends that if a role name were synonymous with an interface identifier, then the claim language requiring each interface to have been assigned a role name would be superfluous. *Id.* Similarly, Defendant argues that if a role name could be an interface identifier, multiple interfaces could not receive the same set of

rules or policies since each identifier would be unique to a single interface. *Id.* at 11.

Defendant further argues that the patentees explained during prosecution that "interfaces with the same role names will get the same set of rules or policies." *Id.* at 11(citing Dkt. No. 44-2 at 203, 236). Finally, Defendant contends that the extrinsic evidence uniformly supports that a role name is a name assigned to interfaces (*i.e.*, something distinct from an interface identifier), such that interfaces assigned the same role name will get the same set of rules or policies. (Dkt. No. 44 at 12) (citing Dkt. No. 44-3 at 18; Dkt. No. 44-4 at 4-5; Dkt. No. 44-5 at 14; Dkt. No. 44-6 at 9-10, 12).

The Court finds that Defendant's negative limitation is unwarranted. First, constructions that import negative limitations without support from the claims, express disclaimer, or independent lexicography are disfavored. *Ethicon LLC v. Intuitive Surgical, Inc.*, 847 F. App'x 901, 907-08 (Fed. Cir. 2021). The term "interface identifier" does not appear in the intrinsic evidence and would lead to further disputes on what "interface identifier" is or how it must be different than the "role name." Thus, Defendant's construction would introduce unnecessary ambiguity into the claim language. As discussed above, the intrinsic evidence indicates that a "role name" is "a name associated with a set of rules or policies." The Court also rejects Defendant's "assigned to interfaces" language, because it is redundant and unnecessary. Claim 18 recites that "each policy target comprises a network device that includes an interface assigned a role name." Accordingly, the Court rejects these aspects of Defendant's construction.

That said, the Court finds it will be helpful to the parties to provide the following clarification. Plaintiff conceded during the claim construction hearing that the role name must be capable of applying to multiple interfaces "to achieve better scalability," as disclosed in the specification. '630 Patent at 6:20–24. However, Plaintiff contends that Defendant does not explain

why information used as a device identifier could not also be used as at least a portion of a role name. (Dkt. No. 45 at 4). Plaintiff also argues that Defendant's extrinsic evidence does not say that a role name cannot incorporate a device identifier. *Id.* at 5. The Court agrees that the intrinsic and extrinsic evidence does not preclude a role name from including some part of an identifier.

However, to the extent that Plaintiff contends that an IP address alone is the claimed "role name," the Court rejects that argument. Likewise, to the extent that Plaintiff contends that an IP address and a role name are synonymous or used interchangeably, the Court rejects that argument. As construed, the term "role name" requires "a name associated with a set of rules or policies," which is more than an IP address.

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"role name"** to mean **"a name associated with a set of rules or policies."**

### B. "customer policy"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "customer policy" | Plain and Ordinary Meaning. | "a policy that defines the rules applied to forward certain types of customer traffic, and includes source/destination host groups, application profiles, traffic profiles, service class policing action and role names" |

### 1. Analysis

The term "customer policy" appears in Asserted Claim 18 of the '630 Patent. The parties dispute whether the patentees expressly defined the term "customer policy" in the specification. The Court finds that patentees did not. Instead, Claim 18 itself provides the meaning of the term "customer policy." *Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). Specifically, Claim 18 recites "defining a

Page 15 of 31

customer policy comprising a tunneling mode and a tunnel group identifier, the customer policy being configured to govern the treatment of individual customer traffic." '630 Patent at 14:1–4. Thus, Claim 18 provides the plain and ordinary meaning of "customer policy" as "comprising a tunneling mode and tunnel group identifier, the policy being configured to govern the treatment of individual customer traffic." No further construction is necessary or warranted.

Defendant argues that the patentees expressly defined the term "customer policy" in the specification. Specifically. Defendant cites to the following:

> Customer policies define the rules applied to forward certain types of customer traffic. Customer policies include source/destination host groups, application profiles, traffic profiles, service class, policing action and role names. Customer policies can be extended to include a tunnel group identifier and a tunneling mode, when supporting MPLS.

'630 Patent at 6:6–11. According to Defendant, the patentees "clearly set forth a definition of the disputed claim term," and "'clearly express[ed] an intent' to redefine the term." (Dkt. No. 44 at 14) (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

The Court disagrees that the patentees expressly defined the term as Defendant contends. The portion of the specification identified by Defendant is an exemplary embodiment. The specification states "*[a]ccording to one embodiment*, different types of policies are used including: Service policies, network policies, customer policies and mapping policies." '630 at 5:58–60. (emphasis added). The placement of this exemplary statement regarding "customer policy" as part of an exemplary embodiment confirms that it is not intended to be definitional.

The Court is also not persuaded by Defendant's argument that the use of the term "comprises" in the claim requires reading into the claim an exemplary embodiment. In fact, the case cited by Defendant confirms that while the "comprising" term allows for an infringing "customer policy" to include additional unrecited components, such additional components are

not themselves limitations. *See CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) ("consistent with this court's precedent, the district court correctly adopted CollegeNet's inclusive definition and rejected ApplyYourself's preclusive definition. While claim 1 does not expressly provide for human intervention, the use of 'comprising' suggests that additional, unrecited elements are not excluded.").

Finally, Defendant argues that "if policy definitions could change from embodiment to embodiment, there would be no meaningful distinction among service, network, customer, and mapping policies because their shifting 'definitions' could collapse into the same thing." (Dkt. No. 44 at 16). This argument is contradicted by the language of Claim 18, which defines each of "mapping policy," "customer policy," and "networking policy" to have different and distinct required limitations. '630 Patent at Claim 18 ("a mapping policy configured to map between an experimental field and a unique per-hop-behavior") ("a customer policy comprising a tunneling mode and a tunnel group identifier, the customer policy being configured to govern the treatment of individual customer traffic") ("a network policy that is configured to define the Diffserv treatment of aggregated traffic"). Accordingly, the Court rejects Defendant's construction, and the term is given its plain and ordinary meaning.

### 2.  Court's Construction

For the reasons set forth above, the term **"customer policy"** is given its **plain and ordinary meaning.**

### C.  "an egress interface of one of multi-protocol label switching tunnels"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "an egress interface of one of multi-protocol label switching tunnels" | Not indefinite; plain and ordinary meaning. | Indefinite. |

### 1.  Analysis

The phrase "an egress interface of one of multi-protocol label switching tunnels" appears in Asserted Claim 18 of the '630 Patent. The parties dispute whether the phrase is indefinite. Defendant argues that there is no antecedent basis for "multi-protocol label switching tunnels" in Claim 18. (Dkt. No. 44 at 16).

Defendant contends that Claim 1 recites "send the mapping policy and the customer policy to interfaces of devices of a network that includes multi-protocol label switching tunnels, corresponding to the tunnels, at least one of the network devices comprising an egress interface of one of said multi-protocol label switching tunnels." (Dkt. No. 44 at 16) (citing '630 Patent at 11:42–49). Defendant argues that the later recited "egress interface of one of said multi-protocol label switching tunnels" refers to the earlier recited multi-protocol label switching tunnels in Claim 1. *Id.* at 16. However, for Claim 18, Defendant argues that the phrase lacks antecedent basis and is indefinite. *Id.*

According to Defendant, there are multiple plausible readings as to which set of tunnels supplies the recited "one of." *Id.* at 17. Defendant argues that Claim 18 could be referring to at least any of the following: (1) an egress interface of any MPLS tunnel in the network, (2) an egress interface of an MPLS tunnel in the tunnel group referenced in the customer policy, or (3) an egress interface of an MPLS tunnel to which the mapping policy applies. *Id.* (citing '630 Patent at 11:8–9, 4:48–50, 10:49–50, Figures 2, 5, 7). Defendant contends that neither the specification or the prosecution history "inform, with reasonable certainty," where the egress interface must be. (Dkt. No. 44 at 17). The Court disagrees.

Claim 18 recites "sending the device-specific commands to policy targets, wherein each policy target comprises a network device that includes an interface." Claim 18 further recites that at least one of these "interfaces comprising an egress interface of one of multi-protocol label

switching tunnels." Thus, the scope of the claim includes sending "device-specific commands to policy targets," where at least one of those policy targets has "an egress interface of one of multi-protocol label switching tunnels." Defendant incorrectly assumes that the scope of the claim must be limited to one specific location for the MPLS tunnel. (Dkt. No.44 at 17). The claim language is broad enough to include the three examples of MPLS tunnels that Defendant identifies from the specification. The law is clear that "breadth is not indefiniteness," and there is no ambiguity as to the scope of the claim. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017). Accordingly, Defendant failed to show by clear and convincing evidence that the claim language is indefinite.

### 2. Court's Construction

The Court finds that the phrase **"an egress interface of one of multi-protocol label switching tunnels"** is not indefinite, and is given its **plain and ordinary meaning**.

### D. "the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups" | Not indefinite; plain and ordinary meaning. | Indefinite. |

### 1. Analysis

The phrase "the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups" appears in Asserted Claim 22 of the '630 Patent. The parties dispute whether the phrase is indefinite. Defendant argues that it lacks antecedent basis. According to Defendant, Claim 22 is indefinite because it is unclear which set of "interfaces" is referenced by "the interfaces." (Dkt. No. 44 at

18). Defendant contends that Claim 18, upon which Claim 22 depends, recites (1) policy targets, where each policy target is a network device that includes an interface, and (2) at least one egress interface as shown below:

---

18. A method comprising:

defining a mapping policy configured to map between an experimental field and a unique per-hop-behavior;

defining a customer policy comprising a tunneling mode and a tunnel group identifier, the customer policy being configured to govern the treatment of individual customer traffic;

defining a network policy that is configured to define the Diffserv treatment of aggregated traffic;

translating the mapping policy, the network policy and the customer policy into device-specific commands; and

sending the device-specific commands to policy targets, wherein **each policy target comprises a network device that includes an interface** assigned a role name associated with the customer policy, **at least one of the interfaces comprising an egress interface** of one of multi-protocol label switching tunnels.

22. The method of claim 18, wherein sending is such that **the interfaces associate with at least one of input roles, output roles and multi-protocol label switching gateways of customer source and destination host groups**.

---

*Id.* at 18-19 (citing '630 Patent at Claims 18 and 22) (emphasis added). Defendant argues that since there are different sets of interfaces (the orange and red annotated in the claims), it is unclear which "interface" is referred to by the term "the interfaces" in Claim 22. (Dkt. No. 44 at 19). According to Defendant, "the interfaces" could refer to the interfaces in each policy target assigned a role name associated with a customer policy, the interfaces comprising an egress interface, or other interfaces in the network. *Id.* Defendant argues that this lack of clarity renders the term indefinite. *Id.*

The Court disagrees that the claim is indefinite. The term "wherein the sending is such that the interfaces…" in Claim 22 refers back to the preceding term of Claim 18 "sending the device-specific commands to policy targets, wherein each policy target comprises a *network device that*

*includes an interface* assigned a role name associated with the customer policy" '630 Patent at 14:9–13. (emphasis added). This is further confirmed by the next term in Claim 18 referencing this same set of interfaces ("at least one of the interfaces…"). Accordingly, Defendant failed to show by clear and convincing evidence that the claim language is indefinite.

### 2.  Court's Construction

The Court finds that the phrase **"the interfaces associate with at least one of input roles, output roles, and multi-protocol label switching gateways of customer source and destination host groups"** is not indefinite, and is given its **plain and ordinary meaning**.

### E.  "sending the mapping policy to the network interfaces further comprises…"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "sending the mapping policy to the network interfaces further comprises…" | Not indefinite; plain and ordinary meaning. | Indefinite. |

### 1.  Analysis

The phrase "sending the mapping policy to the network interfaces further comprises…" appears in Asserted Claim 23 of the '630 Patent. The parties dispute whether the phrase is indefinite. Defendant contends that Claim 23 is indefinite for two separate reasons. Defendant first argues that Claim 23 refers to "wherein sending the mapping policy to the network interfaces further comprises," lacks antecedent basis. (Dkt. No. 44 at 19). Defendant contends Claim 23 depends on Claim 18, but Claim 18 contains no step that sends the mapping policy to the network interfaces.

> 18. A method comprising:
>
> defining a mapping policy configured to map between an experimental field and a unique per-hop-behavior;
>
> defining a customer policy comprising a tunneling mode and a tunnel group identifier, the customer policy being configured to govern the treatment of individual customer traffic;
>
> defining a network policy that is configured to define the Diffserv treatment of aggregated traffic;
>
> translating the mapping policy, the network policy and the customer policy into device-specific commands; and
>
> **sending the device-specific commands to policy targets**, wherein each policy target comprises a network device that includes an interface assigned a role name associated with the customer policy, at least one of the interfaces comprising an egress interface of one of multi-protocol label switching tunnels.
>
> 23. The method of claim 18, wherein **sending the mapping policy to the network interfaces further comprises** issuing new commands to reconfigure a router based on the mapping policy.

*Id.* at 19-20 (citing '630 Patent at Claims 18 and 23) (emphasis added). According to Defendant, Claim 18's sending step sends "device-specific commands," and not a mapping policy as Claim 23 requires. (Dkt. No. 44 at 20). Defendant further argues that Claim 18 sends those commands to "policy targets" and not to "the network interfaces," as recited by Claim 23. *Id.* Defendant contends that Claim 23 is "hopelessly unclear," and this makes the term indefinite. *Id.* Defendant further argues that Claim 18, upon which Claim 23 depends, recites two different sets of interfaces and it is unclear which set of "interfaces" is referenced by "the network interfaces" as it argued for the preceding phrase.

The Court disagrees that the claim is indefinite. Claim 18 recites translating the mapping policy to "device-specific commands," which are sent to one or more "policy targets," which include one or more "network devices," which include one or more "interfaces." '630 Patent at 14:7-12. Accordingly, the term is not "hopelessly unclear." Indeed, for the term "role name"

Defendant argues that "claim [18's] language shows that interfaces with the same role name will get the same set of rules or policies. It recites (1) sending 'device-specific commands' (the translated mapping, network, and customer policies) to 'policy targets,' and (2) defines those targets as devices that include 'an interface'" (Dkt. No. 44 at 9).

Defendant next argues that Claim 18, upon which Claim 23 depends, recites two different sets of interfaces and it is unclear which set of "interfaces" is referenced by "the network interfaces." This is the same argument made for the previous term. For the reasons discussed above, the Court disagrees that the claim is indefinite. Accordingly, Defendant failed to show by clear and convincing evidence that the claim language is indefinite.

### 2. Court's Construction

The Court finds that the phrase **"sending the mapping policy to the network interfaces further comprises…"** is not indefinite, and is given its **plain and ordinary meaning**.

### F. "a bandwidth that is currently allocated for [each of] the data flow[s]"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a bandwidth that is currently allocated for [each of] the data flow[s]" | Plain and Ordinary Meaning. | "number of bytes allocated to [each of] the data flow[s] at the current time" |

### 1. Analysis

The phrase "a bandwidth that is currently allocated for [each of] the data flow[s]" appears in Asserted Claims 1, 11, 17, and 20 of the '884 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the phrase "a bandwidth that is currently allocated for [each of] the data flow[s]" requires construction.

The '884 Patent, is titled "Software Defined Networking Based Congestion Control,"

describes techniques for "adjusting bandwidth allocation by a network element in a communications network." '884 Patent at 1:46–47. The specification explains that network congestion occurs at the physical network switches, and more specifically at the output-port of the switches. *Id.* at 11:13–32. The specification further states that "most data center switches do not address network congestion, which may result in packet losses and may affect a quality of service (QoS) of some data flows." *Id.* at 1:24–26.

The specification discloses using a "network element" to adjust the bandwidth allocated to its various ports. *Id.* at 1:48–51. "[T]he network element includes a plurality of ports, the plurality of ports including a target port and each of the plurality of ports is assigned a corresponding bandwidth allocation." *Id.* at 1:61–64. The network element monitors the dataflow traversing one of its ports, which the specification calls the "target port." *Id.* at 1:50–52. The network element determines the bandwidth currently allocated to the target port and then calculates the fair-share bandwidth of the target port based on the total bandwidth of the network element (or switch) itself. *Id.* at 1:52–60. Having calculated the fair-share bandwidth, the network element (or switch) adjusts the bandwidth allocation of the target port based on the fair-share bandwidth allocation. *Id.* The goal of this bandwidth allocation adjustment is to alleviate network congestion. *Id.* at 11:13–32.

Defendant argues that the specification states that the SDN controller "determines the bandwidth allocation," and sends that information in "advertisement window field in a TCP header." (Dkt. No. 44 at 30) (citing '884 Patent at 13:15–26, 18:7–16). Defendant further argues that the specification provides an example calculation of the bandwidth allocation for a data flow in relation to Figure 4 that shows that a bandwidth that is allocated is the current amount of data (*i.e.*, the data amount in bytes). (Dkt. No. 44 at 31) (citing '884 Patent at 18:17–21). Defendant contends that this term reflects (1) the current and (2) the amount of data allocated to the data flow.

(Dkt. No. 44 at 31).

Defendant also argues that the plain language of the claim and specification foreclose "bandwidth" from including a rate (*i.e.*, bits per second). *Id.* According to Defendant, the claim language is focused on the amount of data flowing through the target port and not the speed of the data flowing through the target port. *Id.* Defendant argues that Claim 4 would not logically work, and that the specification is uniform that the bandwidth allocation is the amount of data (*i.e.*, bytes) and not the speed of the data (*i.e.*, bytes per second). *Id.* at 32. Regarding its "current time" wording, Defendant contends that it clarifies the term by providing context to the jury for when "currently" should be measured, at the current time. *Id.*

The Court finds that replacing "a bandwidth" with "number of bytes" improperly limits the claim to the disclosed embodiment. Defendant correctly argues that the specification uses the unit of measure "bytes" in a mathematical illustration within an embodiment of Figure 4. '884 Patent at 17:14–20; 18:17–21. However, this is just one embodiment. *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment the claims of the patent must be construed as being limited to that embodiment."). Indeed, the specification identifies Figure 4 as an "example embodiment." '884 Patent at 18:17–21, 5:21–23. Accordingly, the Court agrees with Plaintiff that the claims are not limited to a particular unit of measure.

The Court also finds that the intrinsic evidence does not foreclose "a bandwidth" from including a rate. Indeed, the specification describes link capacity in terms of a rate (*i.e.*, "Gbps"). '884 Patent at 12:41–44, 14:53–55, 15:10–13, 16:19–21, 16:62–63. Claim 4 recites that "the *link capacity* being a highest amount of *bandwidth* that may be allocated to the target port." '884 Patent at Claim 4 (emphasis added). Thus, the intrinsic evidence indicates that bandwidth can be either a

rate (*i.e.*, bytes per second) or an amount of data (*i.e.*, number of bytes). Finally, there is nothing unfamiliar or confusing about the term "currently." *Cf. Candela Corp. v. Palomar Med. Techs., Inc.*, No. 9:06-CV-277, 2008 U.S. Dist. LEXIS 59860, at *13 (E.D. Tex. Aug. 6, 2008) ("[T]he purpose of claim construction is to construe those terms that might be unfamiliar or confusing to the jury."). Accordingly, the Court rejects Defendant's construction and gives the phrase its plain and ordinary meaning.

### 2. Court's Construction

For the reasons set forth above, the phrase **"a bandwidth that is currently allocated for [each of] the data flow[s]"** is given its **plain and ordinary meaning.**

### G. "a proportional allocation of a total bandwidth of the network switching element"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
| --- | --- | --- |
| "a proportional allocation of a total bandwidth of the network switching element" | Plain and Ordinary Meaning. | "a number of bytes for the target port calculated as a proportion of the total number of bytes available to the network switching element" |

### 1. Analysis

The phrase "a proportional allocation of a total bandwidth of the network switching element" appears in Asserted Claims 1, 11, 17, and 20 of the '884 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. Like the preceding term, the main dispute between the parties is whether "a proportional allocation" and "a total bandwidth" should be limited to one unit of measure.

Defendant argues that the intrinsic record is clear that allocation of bandwidth refers to the amount of data (*i.e.*, bytes), and not a speed or rate (*i.e.*, bytes per second). (Dkt. No. 44 at 33). For the reasons discussed with the previous term, the Court rejects Defendant's argument. Defendant further argues that the terms "for the target port" and "calculated as a proportion" are

necessary to clarify that (1) the number of bytes is referring to the target port and (2) it is calculated as a proportion. *Id.* Defendant contends that without these phrases, the construction of "a proportional allocation of a total bandwidth of the network switching element" would be nonsensical." *Id.* The Court disagrees.

The full claim element specifies that the "proportional allocation" is for "the target port." Specifically, Claim 1 recites "determining, by the network switching element, a fair share bandwidth allocation *for the target port*, the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of the network switching element." '884 Patent at 22:8–13 (emphasis added). As to "calculated as a proportion," a proportion is definitionally a particular kind of calculation—so there is no reason to specify further that a proportion is calculated. Moreover, the specification consistently uses the term "proportional allocation of" and never uses the term "calculated as a proportion." *See, e.g.*, '884 Patent at Abstract, 1:57–58, 4:8–12, 4:66–67, 12:67–13:5, 13:32–37.

Finally, Defendant's substitution of "total [bandwidth] of the network switching element" with "total [number of bytes] available to the network switching element" introduces unnecessary complexity without providing additional clarity to the phrase. The specification repeatedly discloses "total bandwidth of the network element" and does not use Defendant's wording. *See, e.g.*, *id.* at Abstract, 1:57–58, 3:11–12, 4:8–12, 4:66–67.

### 2.  Court's Construction

For the reasons set forth above, the phrase **"a proportional allocation of a total bandwidth of the network switching element"** is given its **plain and ordinary meaning.**

### H.  "the over-subscription ratio being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target p[a/o]rt"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "the over-subscription ratio being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target p[a/o]rt" | Plain and Ordinary Meaning. | Indefinite. OR "the over-subscription ratio is calculated as the bandwidth allocation of the target port divided by the number of data flows traversing the target port" |

### 1. Analysis

The phrase "the over-subscription ratio being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target p[a/o]rt" appears in Asserted Claims 11 and 20 of the '884 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. Defendant contends that the phrase is indefinite because it has two different interpretations of the ratio's denominator and therefore fails to provide notice of the claim scope with reasonable certainty. (Dkt. No. 44 at 34-35).

As an initial matter, the parties agree that term "the target *part*" is a clerical error that should be corrected to "the target *port*" in Claim 11. The Court agrees. The term uses the definite article "the" to reference a previously introduced term "target *port*," and a POSITA would understand this reference. The phrase "data flows traversing the target *port*" is used twice in prior stanzas and a POSITA would understand "data flows traversing the target *part*" was intended as another use of that phrase. The remaining claims confirm this understanding. For example, Claim 20, which is an apparatus correlate to method Claim 11, recites the same limitation, but without the misspelling. '884 Patent at Claim 20.

Finally, the specification provides descriptions of exemplary embodiments where the "over-subscription ratio" is "a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target *port*." *See, e.g.*, '884 Patent at 3:3–6; 4:58–60; 15:63–65. Accordingly, the Court corrects "the target part" to "the target port" in Claim 11. *See, e.g.*, *Imperium (IP) Holdings v. Apple Inc.*, 920 F. Supp. 2d 747, 757 (E.D. Tex. 2012) ("Judicial

correction of an error in a patent may be available 'if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'") (quoting *Novo Indus. v. Micro Molds Corp.*, 350 F.3d 1348 (Fed. Cir. 2003)).

Turning to the remaining issue, Defendant argues that the plain language of the claim is clear that the term involves a ratio, but the language supports two different interpretations of the ratio's denominator. (Dkt. No. 44 at 34). Defendant contends that one interpretation is that the over-subscription ratio is "the bandwidth allocation of the target port" divided by the "number of data flows." *Id.* Defendant further contends that a second interpretation is that the over-subscription ratio is the "bandwidth allocation of the target port" divided by "[the bandwidth allocation of] the number of data flows." *Id.* at 34. Defendant argues that this means that the over-subscription ratio is a unitless number, for example, 1:2 or 1:N. *Id.* (citing '884 Patent at 16:3–10, 16:11–29). According to Defendant, this interpretation has "support" in the specification, and requires interpreting "bandwidth allocation of" as modifying both the "target port" and "number of data flows traversing the target port." (Dkt. No. 44 at 34).

The Court disagrees with Defendant's analysis. First, the example in the specification cited by Defendant does not result in a unitless number. Instead, it results in the number of data flows (unitless) divided by the link capacity of the switch (Gbps). '884 at 16:4–8. Thus, there is no "support" for Defendant's construction in the specification. Instead, Defendant's first interpretation is the one that has "support" in the specification. Dkt. No. 44 at 34 ("Under this interpretation, the over-subscription ratio results in a numeric value with the same units as 'bandwidth allocation'").

Moreover, Defendant incorrectly assumes that the "number of data flows" must be in the

denominator of the ratio. The claims do not specify the numerator or denominator of the ratio. Instead, the claims simply identify it as a ratio. Defendant's construction improperly reads the denominator requirement into the claims to create the alleged ambiguity.

More importantly, the interpretation that Defendant proposes is not disclosed in the specification. The intrinsic evidence does not indicate that the phrase "bandwidth allocation" could equally modify the "target port" and "the number of data flows traversing the target port." Contrary to Defendant's contention, this is not "the most natural reading of the claim language." (Dkt. No. 44 at 35). Even assuming this term is susceptible to two interpretations, this does not render a claim indefinite. *See Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020) ("The test is not merely whether a claim is susceptible to differing interpretations. Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction."); *see also Denneroll Holdings Pty Ltd. v. Chirodesign Grp., LLC*, No. 4:15-CV-740, 2016 U.S. Dist. LEXIS 21977, at *5 (S.D. Tex. Feb. 23, 2016) ("Orthotic device" not indefinite even though its "meaning ... may vary depending on the context in which it is used."). The "over-subscription ratio" is neither subjective nor qualitative, and Defendant's ability to spell out interpretations mathematically demonstrates it provides sufficient guidance to a POSITA. Accordingly, the Court finds that Defendant failed to prove by clear and convincing evidence that the phrase is indefinite, and gives the phrase its plain and ordinary meaning.

### 2. Court's Construction

The term **"the target part"** in Claim 11 is corrected to **"the target port."** The Court finds that the phrase **"the over-subscription ratio being a ratio of the bandwidth allocation of the target port to a number of data flows traversing the target port"** is not indefinite, and is given its **plain and ordinary meaning**.

Page 30 of 31

## VI.    CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**It is further ORDERED** that due to the stay of this case pending *ex parte* reexamination (Dkt. No. 80), no objections need to be filed to this Order until 14 days after the entry of an order lifting the stay.

**SIGNED this 3rd day of January, 2026.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE